[No. B194141. Second Dist., Div. Two. Dec. 3, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
AHMED ALI HASSAN, Defendant and Appellant.

COUNSEL

Law Offices of Brian D. Lerner, Brian D. Lerner and Christopher A. Reed for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Margaret E. Maxwell and Susan S. Kim, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BOREN, P. J.**—Ahmed Ali Hassan, also know as Ahmed Aly Abdel Azim Hassan, Ahmed Ali Abdel-Azim Ibrahim Hassan, Ahmed Aly and Ahmed Aly Hassan Abdel Azim, appeals from the judgment[1] entered upon his convictions in a court trial of offering a false or forged instrument for recording (Pen. Code, § 115, subd. (a); count 1)[2] and offering false evidence (§ 132; count 2). The trial court sentenced him to the middle term of two years on count 1, staying execution of sentence and placing him on three years' probation on the condition he serve one year in county jail. On count 2, it suspended imposition of sentence and placed him on three years' probation. Appellant contends that there is insufficient evidence (1) he violated section 115, and (2) he violated section 132.

We reverse the conviction of count 2 and otherwise affirm.

---

[1] The record on appeal contains the minute order of the sentencing hearing but not the reporter's transcript of that hearing.

[2] All further statutory references are to the Penal Code unless otherwise indicated.

## FACTUAL BACKGROUND

*The prosecution's evidence*

On October 4, 2002, appellant and codefendant, Ana Beatriz Sequen Deleon (Deleon),[3] went to the offices of Candice Espinoza (Espinoza), a commissioned notary authorized to certify a "confidential marriage,"[4] and Baldomero Aguilera (Aguilera), a minister authorized by a church to solemnize the marriage. After Aguilera solemnized the marriage, appellant and Deleon signed a "License and Certificate of Confidential Marriage" (License) in his presence. Aguilera had reviewed it with them, read the affidavit to them, and explained that a confidential marriage required the parties to be "living together as husband and wife." Espinoza signed and notarized the License and mailed it to the county recorder for recording. A copy given to the parties stated that a certified copy could be obtained from the county recorder.

Teresa Wieland (Wieland), a special agent with Immigration and Customs Enforcement (ICE), investigated cases of marriage fraud that is, marriage entered for the purpose of obtaining a green card for a new spouse. She investigated a petition against appellant filed by Deleon. Wieland suspected marriage fraud because of the difference in the parties' ages, religious affiliations and cultural backgrounds. She examined a photocopy of appellant's Egyptian passport and "P-1" visa, which is granted to a person who is an athlete or entertainer. The visa was valid between March 12, 1998, and April 5, 1998.

On January 28, 2005, at approximately 5:30 a.m., Wieland and FBI Special Agent Craig Moringiello (Moringiello), went to 3911 Lugo Avenue in Lynwood (Lugo residence) to conduct a home inspection to determine if appellant and Deleon were living together as husband and wife. After waiting outside for an hour and seeing no one enter or exit, they knocked on the door and went inside. Appellant was not there, but Deleon and members of her family were. Wieland observed family photographs, but none of appellant, and a crucifix in Deleon's bedroom, but no other religious symbols. It appeared that only one person had slept in Deleon's bed, as one part was unmade and the other part was "perfectly spread."

Deleon was allowed to make a call while Wieland was in the house. Appellant arrived while Wieland was still there. She interviewed him, asking

---

[3] Deleon was also charged with and convicted of count 1 but is not a party to this appeal.

[4] A confidential marriage is described in Family Code section 500, as follows: "When an unmarried man and an unmarried woman, not minors, have been *living together as husband and wife*, they may be married pursuant to this chapter by a person authorized to solemnize a marriage under Chapter 1 (commencing with Section 400) of Part 3, without the necessity of first obtaining health certificates." (Italics added.) Family Code section 511 provides that a recorded confidential marriage certification is not open to the public for inspection.

about his "P-1" visa status. After initially claiming he was a drummer, Wieland testified that he admitted to her that he was not and that his visa was fraudulently obtained so he could enter the United States. Wieland asked him for his "departure documents." He gave her his "I-94" document, which indicated that he entered the United States on April 29, 1999, at Los Angeles International Airport, as an "F-1" status (student), contradicting the information on his passport and visa.[5] Wieland then asked if appellant had a form "I-20," which would confirm enrollment in school. Appellant said it had been taken by immigration, and Wieland saw a copy of it in his immigration file. Appellant said he procured these documents to illegally obtain a Social Security card.

Appellant also gave Wieland a "marriage contract," written in Arabic and dated October 4, 2000, which stated that "the marriage took place at Omar Ibn al Khattab Mosque." He explained that before they could have sex, he had to be married in his religion. He said they had sex at his apartment after they were married at the mosque.

Based on this inspection, Wieland believed appellant's marriage to Deleon was fraudulent. She did not believe he was living in the Lugo residence at that time. Therefore, on March 30, 2005, before 7:00 a.m., she, Moringiello, Los Angeles Police Detective Oakley Fungaroli, and a joint task force returned to the Lugo residence with a search warrant. Wieland waited outside and, this time, saw appellant leave. She then entered the residence and saw that both sides of the bed had been slept in.

Anselmo Hernandez (Anselmo), whose wife, Luz, was Deleon's friend for 25 years, signed a letter, dated October 4, 2002, stating that appellant and Deleon had been living together at the Lugo residence since October 4, 2002, and not before. Deleon's mother, Consuelo, had lived at the Lugo residence with Deleon for 16 years and stated that appellant had not lived with Deleon before the confidential marriage and had never been married in the Muslim faith.

Dafer Dakhil (Dakhil), a director of the Omar Ibn Al Khattab Foundation Mosque in downtown Los Angeles, testified that the Arabic marriage contract was not issued by his mosque. He was unaware of any other mosque in Los Angeles with the name Omar Ibn Al Khattab and found no marriage records at his mosque relating to appellant and Deleon.

---

[5] In rebuttal, Wieland testified that when appellant gave her the "I-94," the stamp matched the "I-94" in his immigration file. But the entry stamp in the passport indicated that he entered the United States in New York, on March, 20, 1998. Wieland had checked the computer system for a control number on the "I-94" in the file and could not find one.

*The defense's evidence*

Appellant testified in his own behalf that on October 4, 2000, he went to "Omar Ibn Al Khattab Mosque" in Downey, where he and Deleon signed a marriage contract. Afterwards, they went to his apartment in Lakewood and had sex. Appellant did not move in with Deleon after the mosque marriage.

On October 4, 2002, appellant and Deleon signed the License and were married in what appellant referred to as an "American Marriage." Before that ceremony, he thought he and Deleon were living together as husband and wife, though they did not live in the same house. He introduced her as his wife and believed they were married before God. After the confidential marriage, he moved in with Deleon at the Lugo residence, opened a bank account with her, obtained insurance on his life for her benefit, and paid utility bills.

Appellant claimed he had left for work on January 28, 2005, at approximately 5:15 a.m., before Wieland arrived, and made his part of the bed before leaving. His clothes were in the closet, and a Koran was in the bedroom.

Appellant testified that he obtained a "P-1" visa in Egypt because he worked there as a drummer with a singing and music group for three or four years. He claimed he told Wieland he had an entertainment visa and was a drummer in Egypt. Appellant applied to Long Beach City College to take an English course and intended to return to school, but could not do so because he was working too much.

Deleon testified that on October 4, 2000, she had an Islamic marriage. After the ceremony, she had sex with appellant for the first time at his apartment. But she had given a written statement that she had never been in appellant's apartment. On October 4, 2002, she had a confidential civil marriage, and began living with appellant afterwards. She was unaware that she and appellant were required to be living together in order to have a confidential marriage, and Aguilera (the minister) did not explain it. She nonetheless believed that they were living together after October 4, 2000, but in different houses. She denied that their marriage was a sham.

*Rebuttal*

Denise Kinsella, the manager of the international student program at Long Beach City College, testified. She prepared "I-20" documents for students to use to apply for an F-1 student visa to enter the United States. She testified that appellant's "I-20" was not produced by her school, as item No. 6 was not checked, there were at least five discrepancies on it, including the class dates,

and there were several typographical errors, spelling errors and other inaccuracies. Also, the signature of Roger Schultz on the "I-20" was not genuine; at that time he was not signing the "I-20's," his title on the form was also incorrect, and records at the college did not indicate that a student named "Abdel Azim," as written on the "I-20," had attended.

On January 28, 2005, when Wieland asked Deleon about the marriage at the mosque, Deleon said she had had a blessing at a mosque on the day of the civil ceremony. She also said that they first had sex on her wedding day, and she had never been to appellant's apartment.

## DISCUSSION

I. *Appellant was properly convicted of violating section 115 (count 1)*

### A. *Introduction*

Section 115, subdivision (a) provides: "Every person who knowingly procures or offers any false or forged instrument to be filed, registered, or recorded in any public office within this state, which instrument, if genuine, might be filed, registered, or recorded under any law of this state or of the United States, is guilty of a felony." Appellant was convicted of violating section 115 by reason of his having signed the License, falsely attesting that he and Deleon "have been living together as husband and wife . . . ." (Fam. Code, § 500.)

### B. *Appellant's contentions*

Appellant contends that his conviction of section 115 is unsupported by substantial evidence that the License was false because "there is no indication that the term 'living together as husband and wife' requires that both the unmarried man and the unmarried woman be living together under the same roof." He argues that he and Deleon were married in a religious ceremony two years before signing the License, believed they were married in the "eyes of God," and consummated their relationship before the confidential marriage.

Appellant further contends that the trial court erred in finding that the License was an "instrument" as defined in section 115. He argues that unlike this case, the cases establishing a broad meaning of "instrument," involve "clearly and intentionally false or forged" documents. These contentions are meritless.

## C. *"Living together as husband and wife"*

### 1. *There is undisputed evidence appellant did not live in the same dwelling with Deleon*

"In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331 [75 Cal.Rptr.2d 412, 956 P.2d 374].) There is overwhelming and uncontradicted evidence that appellant and Deleon were not living together as husband and wife before appellant signed the License attesting that they were. Deleon's close friends testified that she and appellant began living together only after the confidential marriage. Deleon's mother, Consuelo, with whom Deleon had lived for 16 years, testified that appellant had never lived with Deleon before that marriage. Even appellant testified that after the purported mosque marriage in 2000, he did not move in with Deleon until after the confidential wedding. Deleon admitted that she and appellant were not residing in the same house before the confidential marriage, although she claimed they were still living together.[6]

### 2. *"Living together" means living together*

Faced with this uncontroverted evidence, appellant argues that the parties need not have been cohabiting in order to be "living together as husband and wife." He refers us to no authority supporting this claim, nor have we found any. We must therefore determine the meaning of that phrase by interpreting section 115. We review the proper interpretation of a statute and its application to undisputed facts de novo. (*Regents of University of California v. Superior Court* (1999) 20 Cal.4th 509, 531 [85 Cal.Rptr.2d 257, 976 P.2d 808]; *People v. Bergen* (2008) 166 Cal.App.4th 161, 167 [82 Cal.Rptr.3d 577].)

██ In the absence of any legislative or judicial guidance, we construe the language of the statute according to its plain meaning. (*People v. Popular* (2006) 146 Cal.App.4th 479, 484 [52 Cal.Rptr.3d 708]; *Duty v. Abex Corp.* (1989) 214 Cal.App.3d 742, 749 [263 Cal.Rptr. 13].) We must give the language a reasonable and commonsense interpretation, consistent with the apparent purpose and intention of the Legislature. (*In re Rochelle B.* (1996) 49

---

[6] Wieland also concluded that appellant and Deleon were not residing in the same residence based upon her observations during the surprise visit to the Lugo residence at the end of January 2005. But the inspection occurred more than two years after the confidential marriage and is of limited relevance as to whether they were living together at the time of that marriage.

Cal.App.4th 1212, 1216 [57 Cal.Rptr.2d 851].) "If possible, we will give significance to the plain meaning of every word, phrase, and sentence of a statute . . . ." (*Id.* at p. 1216.) When construing a statute, a court must first "examine the words at issue to determine whether their meaning is ambiguous." (*Sand v. Superior Court* (1983) 34 Cal.3d 567, 570 [194 Cal.Rptr. 480, 668 P.2d 787].) If statutory law is " ' "clear and unambiguous there is no need for construction, and courts should not indulge in it." ' " (*In re Lance W.* (1985) 37 Cal.3d 873, 886 [210 Cal.Rptr. 631, 694 P.2d 744].)

 The words "living together" are unambiguous. Their plain, common-sense meaning is cohabiting. "The settled meaning of cohabitation is ' "living together as husband and wife." ' " (*Steven W. v. Matthew S.* (1995) 33 Cal.App.4th 1108, 1114–1115 [39 Cal.Rptr.2d 535] [dealing with the statutory presumption that a child born of a wife cohabiting with her husband, who is not impotent or sterile, is conclusively presumed to be a child of the marriage].) "Cohabitation has acquired a 'peculiar and appropriate meaning' through its use in defining common law marriages. [Citation.]" (*Id.* at p. 1114.) If the Legislature had intended the term "living together as husband and wife" to mean that the parties did not have to live in the same dwelling together, it could have said so. Family Code section 500, for example, could have made the requirement for a confidential marriage to be only that parties are "holding themselves out as husband and wife," rather than "living together as husband and wife."

Appellant argues that by believing they were married before God prior to the confidential marriage, having had sex before that marriage, and having considered themselves married, they were "living together as husband and wife." He is wrong. His interpretation reads the words "living together" out of Family Code section 500 as completely as if they were not there.

The purpose of the confidential marriage statutes is to "shield the parties and their children, if any, from the publicity of a marriage recorded in the ordinary manner, and thereby to encourage unmarried persons who have been living together as man and wife to legalize their relationship." (*Encinas v. Lowthian Freight Lines* (1945) 69 Cal.App.2d 156, 163 [158 P.2d 575].) To accomplish that purpose, Family Code section 500 dispenses with the usual marriage license requirement that the parties obtain a health certificate, and the recorded confidential marriage license is closed to the public. (Fam. Code, § 511.) Interpreting the term "living together" to mean actually residing in the same dwelling is consistent with the statutory purpose.

"Living together as husband and wife" has been described as the " 'holding forth to the world by the manner of daily life, by conduct, demeanor and habit, that the man and woman who live together have agreed to take each

other in marriage and to stand in the mutual relation of husband and wife; and when credit is given by those among whom they live, by their relatives, neighbors and acquaintances to these representations and their continued conduct, then habit and repute arise and attend upon cohabitation.' " (*People v. McIntyre* (1931) 213 Cal. 50, 54–55 [1 P.2d 443].) Occasional illicit intercourse with a person is not sufficient to establish that they have been "living together as man and wife." (*Id.* at p. 55.)

Living in the same dwelling is the most significant characteristic of daily life that creates the impression that a couple is married. It is unmarried couples who have lived together and held themselves out as husband and wife, and any children of that relationship, who are most likely to be embarrassed and stigmatized by revealing in a nonconfidential marriage that they were not previously married, that their representations to others that they were married were a sham, and that children born of that relationship were illegitimate. Family Code section 500 seeks to encourage this group to legalize their marriages with the inducement that the fact that they were not previously married will not be revealed.

### D. *"Instrument"*

Appellant also claims that the License is not an "instrument," as that term is defined in section 115. We disagree.

As appellant points out, several older appellate court opinions adopted a narrow definition of "instrument" as used in section 115. The seminal case, *People v. Fraser* (1913) 23 Cal.App. 82 [137 P. 276] (*Fraser*), held that a birth certificate was not an "instrument" within the meaning of that section. It reasoned that an instrument "as employed in our statutes has been defined to mean an agreement expressed in writing, signed, and delivered by one person to another, transferring the title to or creating a lien on real property, or giving a right to a debt or duty." (*Id.* at p. 85.) Relying on *Fraser*, other appellate cases have applied the same narrow definition of "instrument." (See *People v. Fox* (1977) 73 Cal.App.3d 178, 181–182 [140 Cal.Rptr. 615] [false affidavit of voter registration is not § 115 "instrument"]; *People v. Olf* (1961) 195 Cal.App.2d 97, 109–110 [15 Cal.Rptr. 390] [application for permit to Department of Corporations not § 115 "instrument"].)

More recent cases have criticized *Fraser* and interpreted "instrument" in section 115 more expansively. (See, i.e., *People v. Parks* (1992) 7 Cal.App.4th 883, 887 [9 Cal.Rptr.2d 450] [concluding temporary restraining order is § 115 "instrument"]; *People v. Tate* (1997) 55 Cal.App.4th 663, 666–667 [64 Cal.Rptr.2d 206] [work referral forms filled out by administering agency including number of hours probationer did community service is § 115

"instrument"].) Section 115 was enacted in 1872 to protect the integrity of the judicial process and public records. (*People v. Parks, supra*, at p. 887.) "Nothing in [section 115] suggests that real property records alone are worthy of protection." (*People v. Powers* (2004) 117 Cal.App.4th 291, 296 [11 Cal.Rptr.3d 619] (*Powers*).) "Section 115, by its terms, limits prosecution for filing false or forged instruments to those instruments which, 'if genuine, might be filed, registered, or recorded' under state or federal law. Recording a false or forged instrument is not actionable under section 115 if the instrument was not legally entitled to be recorded. [Citation.] It could be argued that a document entitled to be filed, registered, or recorded is of sufficient legal importance that it constitutes an instrument and is worthy of protection under section 115. The Arizona Supreme Court, interpreting a provision identical to section 115, so held . . . ." (*Powers*, at p. 295.)

*Fraser*'s narrow definition was imported from the recording act in the Civil Code, where title to real property is subjugated to the interests of a good faith purchaser for value who acquires title or a lien by an " ' "instrument that is first duly recorded." ' " (*Powers, supra*, 117 Cal.App.4th at pp. 295–296.) But the *Fraser* court's reliance on real property cases overlooked the broader contemporaneous meaning of the word "instrument." We conclude, in accordance with the modern trend of authority, that the broader definition is the more appropriate one. Confidential marriage certificates are "instruments" within the meaning of section 115, given the requirement that they be recorded, their importance, and the vast legal consequences that flow from them.

## II. *Appellant was improperly convicted of offering false evidence*

### A. *Introduction*

Count 2 charged appellant with violating section 132, which states: "Every person who upon any *trial, proceeding, inquiry, or investigation whatever*, authorized or permitted by law, offers in evidence, as genuine or true, any book, paper, document, record, or other instrument in writing, knowing the same to have been forged or fraudulently altered or ante-dated, is guilty of [a] felony." (Italics added.) Appellant's conviction was based upon his giving a false "marriage contract," and "I-94" and "I-20" forms to Wieland and the ICE in connection with the ICE investigation into whether his marriage to Deleon was fraudulent.

### B. *Contention*

Appellant contends that his conviction of offering false evidence is unsupported by the evidence and contrary to law. He argues that there is no

evidence that his marriage contract was forged, fraudulently altered or antedated because he had entered an Islamic marriage. With respect to the "I-94" and "I-20" forms, while he does not contend that they are authentic, he claims that there was no evidence he knew they were forged or fraudulently altered. Appellant further contends that in any event, providing these documents to federal immigration investigators is not a "trial, proceeding, inquiry, or investigation whatever" because it is unclear whether those terms apply to state or local proceedings or whether they also apply to federal proceedings. We agree with appellant's contention that section 132 is inapplicable to the federal proceeding here. We therefore need not consider his first contention.

## C. *Federal investigation*

Nearly a century and a half ago, our Supreme Court considered an analogous situation in *People v. Kelly* (1869) 38 Cal. 145 (*Kelly*). There, the defendant was convicted in state court of perjury for making a false oath before the Register of the United States Land Office in his application to make proof of settlement and cultivation of a tract of land. (*Id.* at p. 148.) The federal statute making the defendant's conduct a crime stated in part: " '[I]n all cases where any oath, affirmation or affidavit shall be made, or taken before any Register or Receiver . . . of any local Land Office in the United States . . . and such oaths, affirmations or affidavits are made, used or filed in any of said local Land Offices . . . and any person or persons shall, taking such oath, affirmation or affidavit, knowingly, wilfully or corruptly swear or affirm falsely, the same shall be deemed and taken to be perjury, and the person or persons guilty thereof shall, upon conviction, be liable to the punishment prescribed for that offense by the laws of the United States.' " (*Id.* at p. 149.) The California statute under which the defendant was indicted read in part: " 'Every person having taken a lawful oath or made affirmation in any judicial proceeding, or in any other matter where by law an oath or affirmation is required, who shall swear or affirm wilfully, corruptly and falsely in a matter material to the issue or point in question . . . shall be deemed guilty of perjury . . . and upon conviction thereof shall be punished by imprisonment in the State Prison for any term not less than one nor more than fourteen years.' " (*Ibid.*)

██ The Supreme Court held that while defendant's conduct was clearly an offense against the federal law, it was unclear whether the California statute referred only to judicial proceedings and oaths required by California. (*Kelly, supra*, 38 Cal. at p. 150.) The Court stated: "State tribunals have no power to punish crimes against the laws of the United States, *as such*," although the state could punish as an offense against the state any act that was an offense against the laws of both the state and the federal government.

(*Ibid.*) In determining that the perjury conviction was not cognizable in the state court, the Court concluded: " 'In those cases the acts done and charged as violations of the laws of both Governments, are not done in the course of the administration of the laws of either Government; but the matters from which the charge now before us arises are alleged to have occurred under and in the course of the execution of the laws of the United States. Those laws required certain things to be done. Congress had the right to prescribe how they should be done, to regulate the duties of all persons who acted under the law, and to prescribe penalties for the violation of such duties. In such case, if acts are done which, if transacted under the laws of this State, would have constituted offenses under the provisions of our Criminal Code, yet, being done in pursuance of the laws of another Government (having the sole power to regulate the whole proceeding), authorizing the act to be done, prescribing the mode, imposing the duty, and affixing the penalty for the violation of it, the acts cannot be regarded as having been done under the sanction of the laws of this State, so as to subject the parties to punishment under those laws.' " (*Kelly*, at pp. 150–151.)

In short, the Court resolved the ambiguity in the state statute by holding that the state had no authority to enforce the federal criminal law by extending the words "judicial proceeding" to encompass the federal proceeding involving the United States Land Office. (See also *In re Loney* (1890) 134 U.S. 372, 375 [33 L.Ed. 949, 10 S.Ct. 584] [courts of a state have no jurisdiction of a complaint for perjury in a contested election case involving a seat in the Congress of the United States, although the false swearing was before a notary public of the state, the court holding that the " 'power of punishing a witness for testifying falsely in a judicial proceeding belongs peculiarly to the government in whose tribunals that proceeding is had' "].)

 Analogously here, as in *Kelly*, we are concerned with false documents provided in connection with a federal immigration investigation. Several federal laws potentially criminalize the presentation of false or fraudulent documents in connection with that investigation. (See, i.e., 8 U.S.C. § 1324c [providing penalties for document fraud]; 18 U.S.C. § 1546 [fraud and misuse of visas, permits and other documents].) As in *Kelly*, it is unclear whether the language "trial, proceeding, inquiry, or investigation whatever" in section 132 refers only to state or local proceedings or whether it also applies to federal proceedings. The ambiguity is resolved by limiting section 132 to its manifest purpose to protect the integrity of state and not federal proceedings. That avoids a construction in which the federal criminal law is simply enforced by the state law. Because the documents appellant provided ICE were produced pursuant to the laws of the United States which were the sole source of authorization for the ICE investigation, the integrity of the federal proceeding is protected by the federal law.

## DISPOSITION

The judgment of conviction of section 132 is reversed and the judgment is otherwise affirmed. On remand the trial court is directed to dismiss count 2.

Ashmann-Gerst, J., and Doi Todd, J., concurred.