Filed 2/26/24  P. v. Agtarap CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>AMY AGTARAP,<br><br>    Defendant and Appellant. | H049529<br>(Monterey County<br>Super. Ct. No. 19CR002646) |

In 2021, a jury found defendant Amy Agtarap guilty of numerous charges including grand theft, forgery, and other related financial crimes.  The trial court sentenced Agtarap to a total term of three years and four months in county jail.

On appeal, Agtarap raises several issues related to her convictions and sentence.  First, she claims that there was insufficient evidence to support the jury's finding that her misdemeanor conviction for unlicensed activity as a mortgage coordinator was prosecuted within the statute of limitations.  Second, she argues that one of her convictions for grand theft must be reversed because she should have been charged under a more specific statute governing the same conduct.  Finally, in a supplemental brief[1], Agtarap asserts that five of her convictions must be reversed because they involved crimes against the federal government and therefore could not be charged and prosecuted

---

[1] Agtarap's motion to file a supplemental opening brief was granted on May 9, 2023.

under California law.[2]  The Attorney General concedes that there was insufficient evidence to support the jury's finding that Agtarap's misdemeanor conviction was not time-barred, but opposes Agtarap's remaining contentions.

For the reasons explained below, we reverse Agtarap's misdemeanor conviction for unlicensed activity as a mortgage coordinator as time-barred.  In all other respects, we affirm the judgment.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.  *Charges*, *Trial*, *and Sentencing*

On October 5, 2021, the Monterey County District Attorney's Office filed a fourth amended information charging Agtarap with 13 criminal counts as follows: two counts of procuring and offering a false or forged instrument (a forged bankruptcy petition) in victim J.M.'s [3] name without his consent (Pen. Code[4], § 115, subd. (a); counts 1 and 2); one count of procuring and offering a false or forged instrument (a false continuing disability review report) to the Social Security Administration (SSA) (§ 115, subd. (a); count 3); six counts of grand theft by false pretenses of property belonging to victims M.G., B.C., the SSA, J.M., R.G., and M.M. (§ 487, subd. (a); counts 4, 5, 6, 11, 12, and 13); two counts of grand theft by embezzlement of property belonging to victims M.M. and J.M. (§ 503; counts 7 and 8); one count of second degree commercial burglary by

---

[2] In her opening brief, Agtarap also raised two other issues on appeal as follows: (1) she argued that two of her convictions (Counts 1 and 2) for procuring and offering a false or forged instrument should be reversed as time-barred; and (2) she contended the trial court erred in imposing concurrent sentences for two of her convictions (Counts 6 and 9) that were part of the same welfare fraud scheme, thus violating Penal Code section 654.  However, in her reply, Agtarap withdrew both these issues from consideration on appeal based on the arguments and authority presented in the Attorney General's response.

[3] We refer to the victims in the proceedings by their initials only to protect their personal privacy interests pursuant to California Rules of Court, rule 8.90(b)(10), (11).

[4] Undesignated statutory references are to the Penal Code.

2

entering a commercial building owned by the SSA with intent to commit larceny (§ 459; count 9); and one misdemeanor count of unlicensed activity as a mortgage coordinator (Bus. & Prof. Code, § 10139; count 10). For counts 4, 5, 6, 10, 12, and 13, the information also contained a special allegation that these crimes were discovered late, and neither the victims nor investigating agencies could have had actual or constructive knowledge of these crimes before the applicable statutes of limitations had expired. (§ 803, subd. (c), § 802, subd. (e).)

On October 6, 2021, the jury found Agtarap guilty on all 13 counts as charged.

On November 4, 2021, the trial court sentenced Agtarap to the lower term of 16 months in county jail for one count of procuring and offering a false or forged instrument (count 1). The court also imposed three consecutive terms of eight months (one-third the middle term of 24 months) for procuring and offering a false or forged instrument (count 3) and grand theft by false pretenses (counts 4 and 5). The court additionally imposed eight concurrent terms of 16 months in county jail for procuring and offering a false or forged instrument (count 2), grand theft by false pretenses (counts 6, 11, 12, and 13), grand theft by embezzlement (counts 7 and 8), and second degree commercial burglary (count 9). Finally, the court imposed a concurrent term of 180 days in county jail for unlicensed activity as a mortgage coordinator (count 10). Agtarap's total sentence amounted to three years and four months in county jail.

Agtarap timely appealed.

### B. Factual Background

#### 1. Prosecution's Case

##### a. Mortgage Licensing Status (Count 10)

Investigator Jerry Meade of the California Department of Real Estate testified that individuals who perform services on behalf of borrowers that are secured with real property, and receive a commission for such services, are required to have a real estate license. In addition, individuals who request an advance fee or are involved in any type

3

of negotiation process, such as with banks, are required to have a license. After conducting a public search of the department's database, Meade confirmed that Agtarap had never been licensed.

### b. *Offenses Against J.M. (Counts 1, 2, 8 and 11)*

J.M., a doctor at Community Hospital of the Monterey Peninsula, testified that he met Agtarap through her brother, who was working at the same hospital, in 2013. J.M. had mentioned to Agtarap's brother that he was seeking assistance or advice about a loan modification as his home was underwater. J.M. spoke to Agtarap, who told him she was "an expert" in loan modifications, had assisted many people in saving their homes, and guaranteed the loan modification would go through so that J.M. would not lose his home. J.M. hired Agtarap to assist him with his loan modification, at which time Agtarap had J.M. pay her an upfront fee of $20,000. According to J.M., Agtarap promised to save his home, and if she did not succeed, she would refund him the full amount paid. Agtarap did not inform J.M. that she was unlicensed, and J.M. testified that he would not have hired her if he was aware she had no license.

In addition to the initial $20,000 fee, J.M. paid Agtarap additional fees totaling $58,000. This included, but was not limited to, the following items: (1) $8,000 in September 2015, which Agtarap indicated was for attorney's fees only if needed; (2) $20,000 in December 2015, approximately two and a half years after Agtarap began working on J.M.'s case; (3) $15,000 in July 2016 for court fees related to an unlawful detainer action that J.M.'s loan servicer had initiated; and (4) $5,000 in July 2016 for legal proceedings after she needed to consult with some attorneys about his loan. During this time, J.M. believed that the loan modification process was moving forward and did not think anything had gone wrong. J.M. became aware in September 2015 that he was going to lose his home, but continued to pay Agtarap to work on his loan modification

4

with the belief that this would allow him to keep his home. In September 2016, J.M. lost his home through foreclosure.

During his testimony, J.M. identified a number of documents bearing his purported signature that he did not personally complete or sign. This included a bankruptcy petition in his name filed on September 8, 2015, which he never agreed to file and only became aware of after the action had been initiated. J.M. testified that he had never spoken with Agtarap about filing for bankruptcy and did not give her authorization to file a petition on his behalf as he did not want a bankruptcy to appear on his record. J.M. did not personally sign any of the purported signatures in his name within the petition or authorize Agtarap to sign on his behalf.

In February 2016, a second bankruptcy petition was filed on J.M.'s behalf, again without his knowledge or authorization. As with the first petition, J.M. only became aware of this petition after Agtarap filed the Chapter 13 bankruptcy on his behalf. When J.M. confronted her for filing without asking him, Agtarap claimed she had done so in order to allow him to stay in his house longer and continue fighting the foreclosure. J.M. subsequently had the petitions dismissed.

J.M. stated that none of Agtarap's purported actions to save his home were successful, and that in addition to the $58,000 he paid directly to her, he lost approximately $400,000 to $500,000 as a result of losing his home.

### c. *Social Security Fraud (Counts 3, 6 and 9)*

Agent Eric Owen from the Office of the Inspector General for the SSA testified that he was contacted by the Monterey County District Attorney's Office. They informed Owens that they were looking into issues involving Agtarap and discovered that she was receiving Social Security administered disability benefits. Owens investigated further and discovered that Agtarap had filed an application for disability insurance benefits in April 2008. In her application, Agtarap stated that she became unable to work as of February 1, 2008, and was still disabled at the time of her application. Agtarap also

claimed in her application that her only source of income was social security benefits. Agtarap's application was later approved in 2010, and she began receiving benefits dating back to July 2008. Agtarap also began receiving Supplemental Security Income (SSI) payments from March 2010 onwards. At the time Agtarap was awarded these payments, she was also notified that she had to inform the SSA of any changes to her employment or medical condition, and that her disability would be reviewed every few years. In 2013, Agtarap submitted a disability update report to the SSA, where she stated she still could not work due to her disability and had not been self-employed.

After reviewing Agtarap's record in the SSA system, Owen subpoenaed Agtarap's bank records, which revealed that she was receiving additional income besides social security that had not been reported to the SSA.

As a result of this investigation, Owen scheduled an in-person disability review for Agtarap in September 2016. Agtarap did not appear at the scheduled time and only arrived later in the afternoon after someone from the SSA office reached out to her. When Agtarap arrived, she provided a handwritten continued disability report indicating she suffered from various conditions, including a failing liver, severe back pain, and fatigue. She also claimed she required a number of items, such as eyeglasses, canes, walkers, wheelchairs, and a daily back brace, as a result of these ailments. Agtarap additionally confirmed that she remained disabled and had not worked since her last disability review in August 2016.

Owen subsequently conducted surveillance on Agtarap's residence to confirm that she still lived there. He did not see her using a back brace, wheelchair, or a cane, but observed her driving a car. Owen also executed search warrants on Agtarap's home and did not observe her using a wheelchair or walker inside her residence; he further confirmed that she did not use a wheelchair or walker when she came for her review at the SSA office.

6

Linda Natera, an SSA employee, estimated that Agtarap collected approximately $139,000 in social security overpayments that she was not entitled to receive. In addition, an investigator from the Monterey County District Attorney's Office confirmed that Agtarap's accounts reflected deposits of over $800,000 between 2010 and 2016 from sources outside of her SSA payments.

### d. Offenses Against R.G. and M.G. (Counts 4 and 12)

R.G. testified that she was introduced to Agtarap through her son's friend and his family, who suggested she speak to Agtarap when she was losing her house and having trouble paying her mortgage. Although R.G. never met Agtarap in person, they spoke over the phone, at which time Agtarap offered to help R.G. and promised to "take care of everything." Agtarap told R.G. that she would charge $1,800 for her services, which R.G. paid to her via direct deposit. At the time R.G. hired Agtarap, she was not able to make regular payments on her mortgage, but Agtarap told R.G. to not worry about it because she "had [R.G.] covered." R.G. believed Agtarap was qualified to perform loan modifications because she had previously saved the home of the friends who introduced R.G. to her. Agtarap never informed R.G. she was not licensed to do this type of work, and R.G. indicated she would not have hired Agtarap if she had known Agtarap was unlicensed.

In January 2015, R.G. received a letter informing her that she would be losing her home, and ultimately lost her home to foreclosure later that year. Until this point, Agtarap had told R.G. that everything was fine with the loan modification, and R.G. had nothing to worry about. After R.G. lost her home, Agtarap told R.G. she could reverse the foreclosure and continued to suggest other ways to prevent the foreclosure, but none of them worked. R.G. subsequently began to suspect Agtarap was not licensed and was engaging in criminal activity around October 2015. R.G. was evicted from her home in December 2015.

M.G., R.G.'s sister, met Agtarap through R.G. in approximately 2014. R.G. recommended that M.G. also use Agtarap's loan modification services. During their first meeting, M.G. showed Agtarap paperwork related to her mortgage, and Agtarap told her that her modification looked "very promising" and should be "easy" to get done. Agtarap also gave M.G. her business card, which listed her as a finance specialist. Based on this information, M.G. believed Agtarap was licensed appropriately to handle the work on M.G.'s loan modification. Agtarap did not tell M.G. she was not licensed. M.G. paid Agtarap an upfront fee of $2,000 in cash. M.G. also stopped making her mortgage payments around the same time.

In March 2015, M.G. ultimately decided not to pursue the loan modification with Agtarap when she began to suspect things were not right. However, M.G. remained unaware that Agtarap was unlicensed until a formal investigation against Agtarap began at a later time. After M.G. decided not to pursue her loan modification, she asked Agtarap for a refund of her $2,000 payment. While Agtarap initially agreed to a full refund, she later told M.G. she could only refund half of the funds because she had already begun to process paperwork for the loan modification. M.G. never received a partial or full refund.

### e. Offense Against B.C. (Count 5)

B.C. testified that she was forced to stop working in 2009 and began to have difficulty paying for her mortgage. B.C. and her husband owned two homes at the time, including a family residence and a home her husband had inherited from his late parents. Approximately four to five years later, a mutual friend introduced B.C. to Agtarap, who offered to help B.C. save her house by obtaining a loan modification. Agtarap then told B.C. that once the loan modification was filed, B.C. should stop making mortgage payments, which B.C. had still been making regularly. B.C. paid Agtarap an upfront fee of $2,500, as well as additional payments totaling approximately $10,000 for Agtarap's

8

work on the loan modification. According to B.C., Agtarap indicated she was a lawyer and had a license to complete loan modifications.

B.C. further testified that Agtarap had assured her she would save the two homes. However, approximately six months after B.C. began using Agtarap's services, B.C. received a letter from the bank that she and her husband would be losing his inherited home. When B.C. tried to contact Agtarap for more information, she received no response. B.C. and her husband subsequently lost the home to foreclosure. B.C. then hired an attorney to help her save the family's primary home, at which time she discovered Agtarap was neither a lawyer nor licensed to perform loan modifications. B.C. stated she never would have hired Agtarap if she had been aware Agtarap was unlicensed and lying about being a lawyer.

### f. Offenses Against M.M. (Counts 7 and 13)

M.M., Agtarap's second cousin, testified that she contacted Agtarap in 2010 to assist her with obtaining a loan modification with an adjustable rate. Agtarap informed M.M. that she was an experienced financial analyst and had previously done many loan modifications. M.M. assumed Agtarap was licensed to perform this work. M.M. subsequently paid Agtarap an upfront fee of $2,500, at which time Agtarap told M.M. to stop paying her mortgage for three months in order to qualify for the loan modification. M.M. followed Agtarap's advice and stopped paying her loans. She also provided Agtarap with copies of documents needed to process the modification.

M.M. and her family ultimately lost their home to foreclosure in January 2015. Prior to this, Agtarap informed M.M. that her loan modification was going well, and the loan servicer had postponed everything because of the bankruptcy petition. While M.M. and her husband were able to work out an agreement with the purchaser of the house after the foreclosure and sale, Agtarap did not assist them in this process. M.M. stated that if she had been aware Agtarap was not licensed to perform loan modifications, she would

9

not have paid her the $2,500 fee and would have hired someone who was properly qualified.

In 2016, after M.M. and her family were forced to leave their home, Agtarap asked M.M. to lend her $30,000 to assist her in working on a friend's case who had been in an accident. Agtarap told M.M. that she would give her $50,000 if the case settled. M.M. and Agtarap signed a promissory note for this loan, which they had notarized. Agtarap requested that $9,000 be paid in cash and $21,000 be wired to an account in her daughter's name. M.M. asked for the funds back on multiple occasions, but Agtarap kept "avoiding the issue." Ultimately, Agtarap told M.M. that she could not repay her because she had used the funds to remodel her home. M.M. testified that she never agreed that Agtarap could use the funds to remodel her home and would not have given her the funds for that purpose. M.M. also never received any repayment.

### g. Further Investigation

District Attorney Investigator Alicia Cox began investigating Agtarap's business activities after receiving a consumer fraud complaint from R.G. During the course of her investigation, Cox discovered that Agtarap was not a licensed real estate agent. Cox also reviewed numerous documents related to Agtarap during her investigation, including a lawsuit filed by B.C., which she believed was filed in June 2015.

### 2. Defense's Case

Agtarap testified that she worked as a United States federal funder for GMAC Mortgage Company from 2000 to 2005. From 2000 to 2019, Agtarap also worked as an assistant and promoter for Eric Becerra under a company previously known as Universal Mortgage.

Agtarap confirmed she was related to M.M. and that M.M. had asked for her assistance with a loan modification. Agtarap gave M.M.'s file to Becerra's office and "donated" M.M.'s $2,500 payment to her file. Agtarap classified these payments as "donations" to the staff at Becerra's office to work on the file. Agtarap confirmed that

10

M.M. had loaned her $30,000, but claimed in lieu of paying back the loan, she allowed M.M. to live with her without paying rent and supported M.M. and her children financially for over a year. Agtarap admitted that she was neither licensed to perform loan modifications nor a licensed realtor.

Agtarap stated that B.C. made incremental payments totaling $2,500 for a loan modification, but denied that B.C. had paid her $10,000. While Agtarap never met R.G. in person, she stated that R.G. "donated" $1,800 to her file and paid in installments, which Agtarap delivered to Becerra's office. M.G. also paid $2,000 to Agtarap for a loan modification, which Agtarap placed in M.G.'s file with her documents. Agtarap indicated that she negotiated modifications by doing follow-up calls with lenders and banks for these individuals with their permission.

With respect to J.M., Agtarap stated that she worked with him for five years on his loan modification, but was unsuccessful in getting him "[t]o the finish line." She confirmed that J.M. paid a total of $58,000, but indicated this represented his legal fees paid to four different attorneys, not to her personally. While she admitted to filing bankruptcy petitions for J.M., she claimed that she did so with his permission in order to protect his home. Agtarap additionally confirmed that she signed J.M.'s bankruptcy documents, but indicated she had power of attorney and verbal authorization to do so.

Agtarap denied telling any of the victims she was an attorney, mortgage loan originator, or licensed real estate agent, and said that she specifically informed them she was not licensed to perform loan modifications. She stated that she specifically told them she was only facilitating services, and they were all aware they were working with someone else.

On cross-examination, Agtarap confirmed that she filed for disability in 2008, at which point she stopped receiving income from Becerra but continued to refer clients to him at no cost. Agtarap denied receiving any income between 2008 and 2017 apart from social security. She additionally claimed that the $700,000 in deposits to her accounts

11

during this time were donations from individuals to her children's college accounts in exchange for her assistance with their taxes. She did not declare these funds as income as they were deposited to her daughter's account.

## II. DISCUSSION

### A. *There was Insufficient Evidence to Support the Jury's Finding that Count 10 was Timely Prosecuted*

Agtarap contends that there was no substantial evidence to support the jury's finding that her misdemeanor conviction for unlicensed activity as a mortgage coordinator (Bus. & Prof. Code, § 10139; count 10) was prosecuted within the applicable statute of limitations. The Attorney General concedes that there was insufficient evidence to support this finding such that the conviction should be reversed.

Although not an element of the crime, the prosecution bears the burden of proving that the action was commenced within the applicable statute of limitations by a preponderance of the evidence. (*People v. Castillo* (2008) 168 Cal. App. 4th 364, 369.) We review the record for substantial evidence to support the jury's finding that an action was timely commenced, and construe statutes of limitations "strictly [ ] in favor of the defendant." (*Ibid.*)

Pursuant to section 802, subdivision (e)(1), prosecution for a misdemeanor violation of Business and Professions Code section 10139 "shall be commenced within three years after discovery of the commission of the offense, or within three years after completion of the offense, whichever is later." (§ 802, subd. (e)(1).) In addition, the California Supreme Court has held that that "the word 'discovery' is not synonymous with actual knowledge." (*People v. Zamora* (1976) 18 Cal.3d 538, 561-562.) Accordingly, if prosecution for offenses involving fraud, such as the one at issue here, is commenced more than three years after commission of the offense, the statute of limitations may be tolled if the prosecution pleads and proves the following: "(1) when and how the facts concerning the fraud became known to [the victim]; (2) lack of

12

knowledge prior to that time; (3) that [the victim] had no means of knowledge or notice which followed by inquiry would have shown at an earlier date the circumstances upon which the cause of action is founded." (*Id.* at p. 562.)

In the instant matter, the prosecution indicated in the initial complaint filed on March 12, 2019, that Agtarap committed the offense at various points in 2010. The prosecution also alleged that this violation could not have been discovered earlier than September 11, 2017, following an interview between Cox and M.M. as part of Cox's investigation, and that no victim or law enforcement agency had actual or constructive knowledge of the violation prior to this date. However, as argued by Agtarap and conceded by the Attorney General, the record at trial reflects otherwise. Specifically, B.C. testified that she first became aware that Agtarap was not licensed to perform loan modifications after she hired a lawyer to help her save her primary home. While B.C. did not remember when this took place, Cox testified that according to her report, B.C. filed her lawsuit in June 2015. Further, no evidence was presented to contradict B.C.'s statements or the date she filed her lawsuit.

In conclusion, based on the testimony that B.C. discovered Agtarap was unlicensed on or about June 2015, we find there was insufficient evidence demonstrating that the violation could not have been prosecuted within three years of the complaint filed on March 12, 2019. We therefore find there was no substantial evidence to support the jury's finding that count 10 was timely prosecuted within the statute of limitations, and reverse the conviction as to this count.

### B. *Conviction under General Statute for Grand Theft*

Agtarap next argues that her conviction for grand theft from the SSA (§ 487, subd. (a); count 6) violated the *Williamson* rule (*In re Williamson* (1954) 43 Cal.2d 651), which prohibits prosecution under a general statute when the conduct at issue is covered under a more specific statute. Agtarap argues that her conduct, which involved her fraudulent

collection of disability benefits, should have been charged under the specific statute for welfare fraud (Wel. & Inst. Code, § 10980, subd. (c)(2)) and must therefore be reversed.

### 1. Applicable Law and Standard of Review

"Under the *Williamson* rule, if a general statute includes the same conduct as a special statute, the court infers that the Legislature intended that conduct to be prosecuted exclusively under the special statute.  In effect, the special statute is interpreted as creating an exception to the general statute for conduct that otherwise could be prosecuted under either statute." (*People v. Murphy* (2011) 52 Cal.4th 81, 86.)  Accordingly, "[a]bsent some indication of legislative intent to the contrary, the *Williamson* rule applies when (1) 'each element of the general statute corresponds to an element on the face of the special statute' or (2) when 'it appears from the statutory context that a violation of the special statute will necessarily or commonly result in a violation of the general statute.' " (*Ibid.*)  "The rule is not one of constitutional or statutory mandate, but serves as an aid to judicial interpretation when two statutes conflict." (*People v. Walker* (2002) 29 Cal.4th 577, 586.)

As application of *Williamson* rule involves questions of statutory interpretation, we review this issue de novo.  (See *People v. Prunty* (2015) 62 Cal.4th 59, 71 (*Prunty*).)  In interpreting a statute, our primary goal  " 'is to determine the Legislature's intent so as to effectuate the law's purpose.' " (*People v. Ruiz* (2018) 4 Cal.5th 1100, 1105.)

### 2. The Williamson Rule Does Not Apply to Count 6 Because There Was No Conflict Between the General and Specific Statutes

In the instant case, Agtarap was charged and convicted of grand theft by false pretenses from the SSA in the amount of $139,367.20 under section 487, subdivision (a) (count 6).  Theft is defined under section 484, which states that "[e]very person who shall…knowingly and designedly, by any false or fraudulent representation or pretense, defraud any other person of money, labor or real or personal property . . . is guilty of theft." (§ 484, subd. (a).)  Section 487 defines grand theft as theft committed "[w]hen the

14

money, labor, real property, or personal property taken is of a value exceeding nine hundred fifty dollars ($950)." (§ 487, subd. (a).) Section 489 provides that punishment for a conviction of grand theft shall constitute imprisonment in a county jail not exceeding one year or pursuant to subdivision (h) of section 1170. (§ 489, subd. (c)(1).)

Agtarap argues that because the funds she obtained were disability benefits, she should have instead been prosecuted under Welfare and Institutions Code section 10980, which provides in pertinent part: "(c) [w]henever any person has, willfully and knowingly, with the intent to deceive, by means of false statement or representation, or by failing to disclose a material fact, or by impersonation or other fraudulent device, obtained or retained aid under the provisions of this division for himself or herself or for a child not in fact entitled thereto, the person obtaining this aid shall be punished as follows: …[¶] (2) if the total amount of the aid obtained or retained is more than nine hundred fifty dollars ($950), by imprisonment pursuant to subdivision (h) of Section 1170 of the Penal Code for a period of 16 months, two years, or three years, by a fine of not more than five thousand dollars ($5,000), or by both that imprisonment and fine." (Wel. & Inst. Code, § 10980, subd. (c)(2).)

In making her argument, Agtarap relies primarily on the holding in *People v. Gilbert* (1969) 1 Cal.3d 475 (*Gilbert*), which involved similar facts. In *Gilbert*, the defendant was prosecuted under section 484, the older general theft statute, for fraudulently obtaining over $200 in government aid. (*Id.* at p. 477.) The California Supreme Court ultimately ruled that prosecution under section 484 was precluded by the more specific statute for welfare fraud, Welfare and Institutions Code section 11482. (*Gilbert, supra,* 1 Cal.3d at pp. 480-41.) In making its ruling, the court noted that defendant's conduct under the specific statute for welfare fraud would only constitute a misdemeanor offense, but constituted a felony under the general theft statute because of the amount taken. (*Id.* at 480.) As this could result in conflicting penalties being

15

imposed for the same conduct, the court found that the *Williamson* rule applied and reversed the defendant's conviction for theft. (*Id.* at 481-482.)

In response, the Attorney General argues that the *Williamson* rule does not apply here because the punishment provisions between the two statutes in question are parallel, thus demonstrating the Legislature's intent to permit alternative prosecution under either statute. Specifically, the Attorney General contends that the *Williamson* rule does not apply when the general statute in question does not provide for a more severe penalty than the specific statute. The Attorney General notes that after *Gilbert* was decided, the Legislature modified the statutory scheme for welfare fraud by enacting Welfare and Institutions Code section 10980, which authorized prosecution of welfare fraud as a felony if the amount taken exceeded $950. As a result, since the punishment for felony welfare fraud is now the same as the punishment for felony grand theft, the Attorney General contends that the Legislature intended for alternative prosecution under either statute such that the *Williamson* rule does not apply.

As the Attorney General correctly notes, the Legislature amended Welfare and Institutions Code section 11482 in 1984 to refer to the newly-enacted Welfare and Institutions Code section 10980, which set forth the punishment for all welfare offenses. (Stats. 1984, ch. 1448.) This action, which created a two-tiered offense that categorized welfare fraud as a misdemeanor or felony based on the amount of aid obtained, was directly in response to the holding in *Gilbert*. (See *People v. Crow* (1992) 15 Cal.App.4th 1459, 1462.) Accordingly, as welfare fraud may now be prosecuted as a felony, which was not the case when *Gilbert* was decided, we find that the holding in *Gilbert* does not control our decision in the instant matter.

In *People v. Rader* (2014) 228 Cal.App.4th 184 (*Rader*), the Second District Court of Appeal identified three potential conflicts between the provisions in a general versus a specific statute that could trigger the *Williamson* rule as follows: (1) a conflict in potential sentences; (2) a conflict in the applicable statutes of limitations; and (3) a conflict in the

16

required elements of each offense. (*Id.* at p. 198.) The court concluded that if none of these conflicts existed between the statutes, the *Williamson* rule is inapplicable. (*Id.* at pp. 199-200.) For example, in *Rader*, the defendant was prosecuted for petty theft under section 484, subdivision (a), for stealing a meal from a steak house; however, he argued that he should be prosecuted under section 537, subdivision (a)(1), which specifically criminalizes the conduct of not paying after obtaining food from a restaurant. (*Rader, supra,* 228 Cal.App.4th at p. 199.) The court found that there was no conflict between the two offenses that would trigger the *Williamson* rule, as they both: (1) permitted conviction if food was taken and not paid for; (2) constituted misdemeanor offenses if the food's value was below $950, and therefore carried the same potential sentences; and (3) were subject to the same statute of limitations. (*Ibid.*)

As the instant matter similarly involves general and specific crimes involving theft, we find the ruling in *Rader* particularly instructive in analyzing whether a conflict exists between the two statutes at play. In examining these statutes, we find they are similar in identifying the conduct they proscribe. While section 487 encompasses a broader range of prohibited acts as it refers to the taking of *any* money, labor, real or personal property, both statutes permit conviction for the same conduct, namely, Agtarap's fraudulent taking of funds from the SSA. They both constitute felony offenses if the value of the funds taken exceeded $950, as was the case here, and are subject to the same potential sentences under section 1170, subdivision (h). Lastly, both offenses are subject to the same statute of limitations. (See § 803, subds. (c)(1) & (5).) Therefore, we find no conflict between the two statutes that would trigger the *Williamson* rule and require a reversal of Agtarap's conviction for grand theft in count 6.

### C. Convictions for Offenses Involving Crimes Against the Federal Government

In a supplemental brief, Agtarap claims that five of her convictions should be reversed because they involved crimes against the federal government that could not be properly prosecuted in state court. The specific crimes cited by Agtarap as subject to

17

reversal are as follows: filing forged bankruptcy petitions on behalf on J.M. (§ 115, subd. (a); counts 1 and 2), filing a false continuing disability report with the SSA (§ 115, subd. (a); count 3), grand theft by false pretenses of disability benefits from the SSA (§ 487, subd. (a); count 6), and second-degree commercial burglary for entering the SSA building with intent to commit larceny (§ 459; count 9.) Relying on *People v. Hassan* (2008) 168 Cal.App.4th 1306 (*Hassan*), Agtarap claims that because all of these crimes concerned false or fraudulent activities involving a federal court or a federal agency, they could not be properly charged and prosecuted under [state] [5] law; therefore, the evidence presented to support these charges was legally insufficient. For the reasons explained below, we find no merit to Agtarap's contentions.

### 1. *Standard of Review*

In general, when determining whether the evidence is sufficient to support a conviction, we "review 'the whole record in the light most favorable to the judgment' and decide 'whether it discloses substantial evidence . . . such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.]" (*People v. Hatch* (2000) 22 Cal.4th 260, 272.) However, in the instant case, we do not examine the sufficiency of the evidence to support the convictions as charged; instead, Agtarap asks us to determine whether it was proper to charge her under state law instead of federal law. Such a question is one of statutory interpretation, which we review de novo. (See *Prunty, supra,* 62 Cal.4th at p. 71.)

---

[5] Agtarap's brief states that the crimes cannot be prosecuted under federal law, which appears to have been an inadvertent mistake based on her argument.

18

### 2. *Agtarap was Properly Prosecuted Under State Law for Her Conduct Involving Federal Entities*

In *Hassan,* the defendant provided a false marriage contract and immigration forms to Immigration and Customs Enforcement (ICE) agents in connection with an investigation into the validity of his marriage. (*Hassan, supra,* 168 Cal.App.4th at p. 1316.) The defendant was subsequently convicted of violating section 132 for offering false evidence in a "trial, proceeding, inquiry, or investigation whatever." (*Hassan, supra,* 168 Cal.App.4th at p. 1316.) The defendant claimed there was insufficient evidence to support the conviction because it was unclear whether the terms "trial, proceeding, inquiry, or investigation whatever" applied only to state or local proceedings or included federal proceedings. (*Id.* at p. 1317.) The Third District Court of Appeal agreed, relying primarily on *People v. Kelly* (1869) 38 Cal.145 (*Kelly*), which involved similar ambiguities regarding the scope of the term "judicial proceedings" in a state statute for perjury. The court in *Kelly* ultimately ruled that the term should not be extended to include federal proceedings because " '[s]tate tribunals have no power to punish crimes against the laws of the United States [.]' " (*Hassan, supra,* 168 Cal.App.4th at p. 1317, quoting *Kelly, supra,* 38 Cal.145 at p. 150.) Noting that several federal statutes potentially criminalized the defendant's conduct, the *Hassan* court found that the best approach to resolving the ambiguous language in section 132 was to limit its application to state proceedings. (*Hassan, supra,* 168 Cal.App.4th at p. 1318.) The court concluded that such an approach would prevent "a construction in which the federal criminal law is simply enforced by the state law." (*Ibid.*)

However, contrary to Agtarap's assertion, the *Hassan* court did not indicate that its ruling barred states from prosecuting *any* conduct that also constituted a crime against the federal government. In fact, the court specifically indicated otherwise by citing the following language from *Kelly* that "the state could punish as an offense against the state any act that was an offense against the laws of both the state and the federal

19

government." (*Hassan, supra,* 168 Cal.App.4th at p. 1317.) We find this to be the case in the instant matter.

Unlike the state statutes at issue in *Hassan* and *Kelly*, which contained ambiguous language about their application to federal entities or proceedings, the statutes under which Agtarap was convicted contain no such ambiguity. With respect to Agtarap's convictions in counts 1, 2, and 3 for filing false or forged documents, section 115, subdivision (a) applies to "false or forged instruments…which instrument, if genuine, might be filed, registered, or recorded under any law of this state or of the United States." The language, therefore, clearly applies to filings made pursuant to federal law, which would include the bankruptcy petitions and continuing disability report filed by Agtarap. While the statutes governing Agtarap's convictions in count 6 for grand theft (§ 487, subdivision (a)) and count 9 for second degree burglary (§ 459) do not contain similar language, both statutes clearly state that they apply to the taking of "any" money in section 487 or entry of "any" building in section 459 without qualification or limitation to the meaning of such terms. Accordingly, we find that Agtarap's charged crimes constituted offenses against both state law and federal law such that prosecution under state law was proper.

## III. DISPOSITION

The judgment is reversed as to the misdemeanor conviction on count 10, and the sentence as to that count is vacated. In all other respects, the judgment is affirmed. The trial court is directed to prepare an amended abstract of judgment and forward a certified copy of the amended abstract of judgment to the Monterey County Sheriff's Office.

_____

                      Wilson, J.

WE CONCUR:

_____

Bamattre-Manoukian, P.J.

_____

      Adams, J.[*]

*People v. Agtarap*
H049529

---

[*] Judge of the Santa Clara County Superior Court, assigned by the Chief Justice pursuant to Article VI, section 6 of the California Constitution.