Filed 3/26/26

CERTIFIED FOR PUBLICATION
COURT OF APPEAL, FOURTH APPELLATE DISTRICT
DIVISION ONE
STATE OF CALIFORNIA

| | |
|---|---|
| Steven N., <br><br>     Plaintiff and Respondent, <br><br>     v. <br><br> Priscilla C., <br><br>     Defendant and Appellant. | D085731 <br><br><br><br> (Super. Ct. No. 24FL009009C) |

APPEAL from an order of the Superior Court of San Diego County, Rebecca Church, Judge. Appeal treated as a petition for writ of mandate; petition granted.

Cage & Miles, John T. Sylvester; Law Offices of Alexandria Jones and Alexandria Jones for Appellant Priscilla C.

Yvonne M. Rizzo for Respondent Steven N.


This case calls upon us to determine whether the trial court erred in refusing to set aside a voluntary declaration of parentage (VDOP) pertaining to a young child.

California law generally permits an unmarried woman who gives birth to a child and another person who is the child's genetic parent to sign a

VDOP to establish parentage. (Fam. Code, § 7573, subd. (a)(1).)[1] A VDOP is void, however, if, at the time of its execution, a third person is already a presumed parent to the child under section 7611, subdivisions (a) or (b). (§ 7573.5)

Section 7611, subdivision (a) in turn provides that a person may be a presumed parent of a child if the person was married to the birth mother at the time of birth. A marriage may give rise to presumed parent status even if it is terminated by an "annulment" or a "declaration of invalidity." (*Ibid*.) Additionally, under section 7611, subdivision (b), a person may be a presumed parent if the person "attempted to marry" the birth mother "by a marriage solemnized in apparent compliance with law," even if the "attempted marriage is or could be declared invalid," under specified circumstances.

In this case, Steven N.[2] filed a petition for custody pertaining to then two-year-old Stella N. based on a VDOP that he and Stella's mother, Priscilla C., signed one day after Stella's birth. In response, Priscilla filed an application to set aside the VDOP as void on the ground that, at the time she signed it, she was married to another man, Gianni V., and Gianni was thus Stella's presumed parent under section 7611, subdivision (a). Priscilla supported her application with a copy of a confidential marriage certificate registered one year before Stella's birth listing Priscilla and Gianni as spouses. (See § 500 et seq. [providing for a "confidential" marriage license and certificate].) Steven objected to the application to set aside the VDOP on

---

[1]    Unless otherwise specified, all subsequent statutory references are to the Family Code.

[2]    We use first names for purposes of clarity and to protect the anonymity of the minor child.

2

the ground that Priscilla's marriage to Gianni was invalid because the two had not "been living together as spouses" before the marriage as is required to obtain a confidential marriage under California law. (§ 500.)[3] After a hearing, the trial court ruled that the marriage was "invalid" for this reason and therefore denied Priscilla's application to set aside the VDOP.

Priscilla filed this appeal from the court's order. For the reasons explained in detail below, we first conclude that the trial court's order denying Priscilla's application to set aside the VDOP is not appealable, but we nevertheless exercise our discretion to treat Priscilla's appeal as a writ petition. Next, on the merits, we explain that, while the trial court focused on the question of whether Stella and Gianni's marriage was valid, the text of section 7611 makes clear that a marriage need not be valid to give rise to presumed parenthood status under certain circumstances. We further conclude that, at the time Priscilla signed the VDOP, Gianni was a presumed parent to Stella at least under subdivision (b) of section 7611 given the undisputed evidence of his attempted marriage to Priscilla in apparent compliance with the law. We therefore determine that the VDOP is void as a matter of law under section 7573.5, subdivision (a)(1). Accordingly, we grant Priscilla's petition for a writ of mandate and direct the trial court to vacate

---

[3] As the court in *People v. Hassan* (2008) 168 Cal.App.4th 1306 (*Hassan*) explained, "The purpose of the confidential marriage statutes is to 'shield the parties and their children, if any, from the publicity of a marriage recorded in the ordinary manner, and thereby to encourage unmarried persons who have been living together as man and wife to legalize their relationship.'" (*Id*. at p. 1314.) To further that end, a "confidential marriage license is a confidential record and not open to public inspection without an order from the court." (§ 511.)

its order denying her application to set aside the VDOP as void, enter a new order granting Priscilla's application, and conduct further proceedings as appropriate.

FACTUAL AND PROCEDURAL BACKGROUND

In August 2024, Steven filed a petition for custody pertaining to then two-year-old Stella. Along with his petition, Steven attached a VDOP that he and Priscilla signed on October 5, 2021, the day after Stella's birth. The VDOP lists Priscilla as the "Birth Parent," and Steven as the "Other Parent." A section of the VDOP form contains boxes checked "yes" next to questions asking, "Is the birth parent unmarried?" and "Is the other parent the genetic father of the child?" (Some capitalization omitted.)

In response to Steven's custody petition, Priscilla filed an application to set aside the VDOP as void under section 7573.5. In her application, Priscilla claimed that the VDOP was void because, approximately one year before Stella's birth, she had married Gianni and Gianni was Stella's presumed parent under section 7611, subdivision (a).

In her application, Priscilla wrote: "On October 10, 2020, I married . . . Gianni. . . . On October 4, 2021, I gave birth to a daughter, Stella. After Stella's birth, [Steven] . . . had me sign a form at the hospital he filled out . . . . He indicated to me that the hospital needed the form and I did not need to review it. I later found out that the form was [a] Voluntary Declaration of Paternity[4] which incorrectly characterized me as 'single'. "

---

4      Amendments to the Family Code have revised certain provisions to be gender neutral, such as referring to a "voluntary declaration of parentage" (Stats. 2018, ch. 876, § 29) instead of a "voluntary declaration of paternity" (*Id*., § 28). Through this opinion, we use the current statutory language, except in quotations or referring to prior law.

Along with her application, Priscilla attached a copy of a "Confidential License and Certificate of Marriage" registered by the County of San Diego (County). (Some capitalization omitted.) As described in detail below, this document indicates that: a marriage license was issued on August 31, 2020 to Priscilla and Gianni, the couple were married on October 10 of that year, and the marriage certificate was recorded nine days later, on October 19.[5]

The certificate/license first lists Priscilla and Gianni as the bride and groom and provides separate addresses for each person. In a section of the license/certificate entitled "Affidavit," Priscilla and Gianni attested to the following facts, "We, the undersigned, currently living together as spouses, declare under penalty of perjury under the laws of the State of California that we are unmarried and that the forgoing information is true and correct to the best of our knowledge and belief." (Some capitalization omitted.) Another section of the form, entitled "License to Marry," lists an issuance date of August 31, 2020. (Some capitalization omitted.) An additional section includes a Catholic priest's name and signature as the person who had solemnized the marriage as well as the October 10, 2020 date of marriage. A final section indicates that the County registered the document as a marriage certificate on October 19, 2020.

Steven filed both a brief in opposition to Priscilla's application to set aside the VDOP and a responsive declaration. In his brief, Steven argued that Priscilla and Gianni "lied when they certified on the 'confidential

---

[5]     Under California law, "one document serves as both marriage license and certificate: '[T]he document issued by the county clerk is a marriage license until it is registered with the county recorder, at which time the license becomes a marriage certificate.' " (*In re Marriage of Cantarella* (2011) 191 Cal.App.4th 916, 921, fn. 5 (*Cantarella*).)

marriage license and certificate of marriage,' that they were 'living together as husband and wife,' as is required to obtain a confidential marriage license in the State of California." Steven maintained further that "[t]here are false statements on the certificate [of marriage] such that the marriage is invalid, or at least in question."

Priscilla also filed both a reply brief in support of her application to set aside the VDOP and her own declaration. In her brief, Priscilla argued that the VDOP was rendered void by operation of law because she was married to Gianni at the time Stella was born.

On January 15, 2025, the court held an initial hearing on the matter, noting that it had both Steven's request for custody and Priscilla's application to set aside the VDOP before it. First, after discussing the issue with counsel, the court set an evidentiary hearing on Priscilla's application to set aside the VDOP for the following week.

Next, the trial court addressed Steven's request for custody. After hearing argument from counsel, the court declined to order custody or visitation in favor of Steven "pending [a] formal parentage determination." The court repeatedly stressed that its order was "interim" in nature, and that it was based on the record "at this time." The court explained in part, "Clearly, there is a dispute as to the VDOP. There is clearly a request to set aside, which is pending. And there's [a] dispute as to that." The court also noted that Steven "ha[d] not seen the child since the child was an infant," and "the policy of the State of California to focus on the best interest of the minor child and . . . issue interim orders such as these to preserve the parent-child relationship." The court continued, "So, at this time, I'm not going to be ordering visitation between [Steven] and the child. . . . And the policy that I think I'm most guided by is what's in the best interest of this minor child.

6

And based on the record that I have, I can't find, at this time, that it is ordering interim visitation orders." While the court declined Steven's counsel's request to trail the custody matter until after the VDOP hearing, the court stated that, "I certainly would be open to hearing argument about shortening time . . . if facts and circumstances change."

A week later, on January 22, the court held an evidentiary hearing on Priscilla's motion to set aside the VDOP at which Priscilla and Steven testified.

Priscilla testified that Gianni proposed to her on August 31, 2019, and they announced their engagement to family and friends shortly thereafter. Priscilla also claimed she began living with Gianni at the end of July 2020 and was living with him when they filled out the application for a marriage license in August of that year. She also explained that, prior to getting married, she and Gianni completed a six-month long "Pre-Cana" course so that they could get married in the Catholic Church. Priscilla stated that she married Gianni on October 10, 2020, and the marriage was conducted at a full mass officiated by a priest. Priscilla explained that she remained married to Gianni when she signed the VDOP on October 5, 2021.

Priscilla also acknowledged having had a relationship with Steven that became intimate in early 2019, continued after she was married to Gianni, and ended in February 2022. Although Priscilla denied having moved in with Steven in July of 2020 or having become engaged to him, she did acknowledge living with Steven beginning in March of 2021 when she found out she was pregnant with Stella. Priscilla also admitted signing the VDOP but claimed she had not read it before doing so. She explained she thought that the VDOP form pertained to Stella's name. Priscilla also acknowledged she never told Steven that she was married.

At the conclusion of Priscilla's testimony, the following colloquy occurred:

> "[The court]: So, for your wedding on October 10th, 2020, was that the time, in your mind, that you became husband and wife with [Gianni]?
>
> "[Priscilla]: Yes.
>
> "[The court]: And prior to that, were you presenting yourself, in any way, as married to [Gianni]?
>
> "[Priscilla]: We were engaged but not married before [October 10, 2020], no."

During Priscilla's testimony, the court admitted in evidence copies of two photographs, one that Priscilla stated depicted Gianni proposing to her and a second that she said showed her on her wedding day with Gianni and the priest that married them. The court also admitted in evidence the October 10, 2020 confidential marriage license/certificate and the October 5, 2021 VDOP described above.

Steven testified that he and Priscilla had gotten engaged in July 2020, and that she had moved in with him that same month.[6] Steven also explained that he signed the VDOP in October 2021. He also stated that he and Priscilla had chosen the name Stella for the child, and that it represented a combination of Steven's and Priscilla's names.

At the conclusion of the hearing, the court issued an oral ruling on Priscilla's application to set aside the VDOP. The court began by describing

---

[6]    The court admitted in evidence a receipt for a ring, which Steven testified was an engagement ring that he had given to Priscilla. Priscilla testified that Steven gave her a ring to demonstrate that he was going to "change the way he was treating [her]," but that the two were never engaged.

the issue it was required to decide by stating: "I have to determine whether or not [Priscilla] . . . was disqualified from executing the voluntary declaration of paternity . . . .  There, of course, is the issue raised of whether there's a presumed parent under 7611[, subdivision] (a) and whether she was a married woman at the time of executing the voluntary declaration of paternity."

In deciding this issue, the court first discussed the Legislature's purpose in authorizing individuals to obtain a confidential marriage under section 500.  The court observed: "[T]he theory — at least that the [L]egislature and case law has provided — is that it's encouragement for people who are already living as spouses to enter into a marriage to validate their marriage by not exposing their status — their marital status that they were unmarried for some period of time, to be able to have a confidential license to then take the next step and make it a valid marriage.  So that's the theory behind [section] 500.  [¶]  I . . . did find useful the analysis in published case 168 Cal.App.4th 1306.  That's *People versus Hassan*, *H-a-s-s-a-n*.  That one is actually a criminal case, but that one does discuss the question of what living together means, pursuant to [section] 500, and, essentially, that the settled meaning of cohabitation is living together as husband and wife.  That's essentially what the Court considers [section] 500 to be referring to, is that it's more than roommates.  It's more than cohabitating.  It's cohabitating as spouses."

The court further concluded that the evidence established Priscilla and Gianni had not cohabitated as spouses before obtaining their confidential marriage.  The court reasoned in part: "Here, even putting the burden of proof on [Steven], the testimony submitted by both sides is essentially uncontroverted as to the issue of 'as spouses,' that that was not present at the

9

time of obtaining the confidential marriage license. The big dispute of fact is [as] to the cohabitation issue. [¶] I still have disputed testimony as to whether and to what extent there was cohabitation. But even crediting [Pricilla's] testimony, it was a limited period of time — for about a few months prior to securing the marriage license — the confidential marriage license — that she was cohabitating with [Gianni]. [¶] But it's clear from the engagement, from the announcement of the engagement, from the Pre-Cana work that was prepared, and from [Priscilla's] own testimony, that she was not cohabitating as spouses with [Gianni] when securing the marriage license — the confidential marriage license, as required by [section] 500."

Next, the court reasoned, "[Priscilla] was not disqualified from executing the VDOP, as the marriage was invalid pursuant to the confidential marriage license that was secured."

The court ruled, "I'm declining the request to set aside the voluntary declaration of paternity. That is the request before me. That's the order I'm making. And that's the order of the Court."

On February 5, 2025, Priscilla filed a series of objections to the court's oral statement of decision rendered at the January 22 hearing. Among other objections, Priscilla claimed that the trial court's oral statement of decision was "uncertain because it fail[ed] to provide the legal basis for the Court's interpretation of 'living together as spouses' under [section] 500 to mean that [Priscilla] and her non-party spouse needed to hold themselves out as spouses in addition to their 'limited period of time' of cohabitation."

On February 25, 2025, the trial court entered a written order denying

10

Priscilla's motion to set aside the VDOP.[7]  The order provides in relevant part:

> "[S]ection 500 requirement of living together 'as spouses':
>
> "Testimony submitted by both sides is uncontroverted as to the issue of 'as spouses.'  The requirement of living together 'as spouses' was not met when the confidential marriage license was obtained.
> "Cohabitation Requirement:
>
> "There is a dispute of fact as to whether and to what extent [Priscilla] was cohabiting with [Gianni] when she obtained a confidential marriage license with him. [Priscilla] was not living together as the issue of whether the marriage of [Priscilla] is void [*sic*].
>
> "The court finds that it is clear from the engagement, from the announcement of the engagement, from the Pre-Cana work that was prepared, and from [Priscilla's] own testimony, that she was not cohabiting as spouses with [Gianni] when securing the confidential marriage license, as required by . . . section 500.
>
> "The court finds that [Priscilla] was not disqualified from executing the VDOP as the marriage was invalid. The marriage is invalid based on [Priscilla] not meeting the requirements for a confidential marriage license that was secured by her.
>
> "The court finds that [Priscilla] was not qualified to obtain the type of license she secured and therefore there is no presumption of validity in this case."

The court "denie[d] [Priscilla's] request to set aside the VDOP she and [Steven] executed."

The following day, Priscilla appealed from the trial court's February 25 order denying her application to set aside the VDOP.

---

7    The record does not contain any order expressly ruling on Priscilla's objection to the court's oral statement of decision.

11

While Priscilla's appeal was pending, she requested that the trial court stay the enforcement of its order pending our review. The trial court issued an order granting Priscilla's request in part by staying enforcement of its order solely for the limited purpose of permitting Priscilla and "her soon to be born child" to maintain health insurance coverage through Gianni's employment.

In addition, while Priscilla's appeal was pending, we requested and received supplemental briefing from the parties with respect to the potential relevance of section 7611, subdivision (b) to the issues on appeal.

## DISCUSSION

A. *The trial court's order denying Priscilla's motion to set aside the VDOP as void is not appealable*

Priscilla argues that the trial court's February 25, 2025 order denying her motion to set aside the VDOP as void is appealable. We disagree.

Priscilla presents two theories of appealability. First, she contends that the February 25 order is an appealable postjudgment order under Code of Civil Procedure, section 904.1, subdivision (a)(2).

Code of Civil Procedure section 904.1 specifies the appealability of judgments and postjudgment orders in relevant part as follows: "(a) . . . An appeal, other than in a limited civil case, may be taken from any of the following: [¶] (1) From a judgment . . . . [¶] (2) From an order made after a judgment made appealable by paragraph (1)."

As the statutory text indicates, to constitute an appealable postjudgment order under Code of Civil Procedure, section 904.1, subdivision (a)(2), the order must, as a threshold requirement, be "made after an appealable judgment." (*Lakin v. Watkins Associated Industries* (1993) 6 Cal.4th 644, 651 (*Lakin*).) So, we first consider whether the VDOP itself was

12

an appealable judgment. We are aware of no authority, and Priscilla cites none, holding that a VDOP is an appealable judgment. Family Code section 7573, subdivision (d) merely specifies that a VDOP may be "equivalent to a judgment of parentage." The statute does not specify that a VDOP is a final judgment for all purposes. Nor does the VDOP statutory scheme itself make any provision for appellate review.

Moreover, even assuming that a VDOP is a judgment, it is one that is obtained through a stipulation, and "[o]rdinarily, a judgment entered pursuant to a stipulation is not appealable." (*Adoption of Matthew B.* (1991) 232 Cal.App.3d 1239, 1267.) And even if a VDOP could be appealed on the ground that it is void (cf. *id.* at p. 1268 [assuming a party can appeal from a stipulated paternity judgment on the ground that it is void]), there remain practical obstacles that would arise from permitting an appeal from a VDOP given its "unique characteristics" that set it apart from an ordinary judgment. (*Pazderka v. Caballeros Dimas Alang, Inc.* (1998) 62 Cal.App.4th 658, 667 (*Pazderka*) [discussing a judgment entered pursuant to an agreement pursuant to Code of Civil Procedure section 998 (section 998 judgment)].) Specifically, a VDOP is not the result of any judicial decisionmaking. (Cf. *Pazderka*, at p. 667 [concluding that a section 998 judgment is not appealable in part because "[a]t no time during the entire process leading to entry of a section 998 judgment does a judge or jury ever consider the validity of the agreement" leading to the *judgment* and stating that "if the trial court has taken no action, we have nothing to review"].) A VDOP is a private agreement that does not arise from judicial action of any kind; it "takes effect on the filing of the document with the Department of Child Support Services." (§ 7573, subd. (c).) A VDOP is never entered by the court as a judgment to resolve a pending action. In fact, there would

13

ordinarily be no existing case within which a notice of appeal from a VDOP could be filed. Further, even if a VDOP were filed in court, in an appeal from a VDOP, there would be essentially no appellate record other than the VDOP itself for a reviewing court to consider. (Cf. *Pazderka*, at p. 667 ["[a]n appeal from a section 998 judgment order would be meaningless, because there would be no record for this court to review"].)

For all these reasons, we conclude that a VDOP is not an appealable judgment. Therefore, an order denying a request to set aside a VDOP is not an order "made after an appealable judgment." (*Lakin, supra*, 6 Cal.4th at p. 651.)

In any event, even if an order denying a request to set aside a VDOP as void met the threshold statutory requirement of being made after an appealable judgment, the order entered in this case does not satisfy an additional requirement for appealability of a postjudgment order under California law. As the Supreme Court in *Lakin, supra*, 6 Cal.4th at page 651 explained, "Despite the inclusive language of [former] Code of Civil Procedure section 904.1, subdivision (b) [current Code of Civil Procedure section 904.1, subdivision (a)(2)], not every postjudgment order that follows a final appealable judgment is appealable. To be appealable, a postjudgment order must satisfy two additional requirements." First, "the issues raised by the appeal from the order must be different from those arising from an appeal from the judgment." (*Ibid.*) Second, "the order must either affect the judgment or relate to it by enforcing it or staying its execution." (*Id.* at pp. 651–652.) Postjudgment orders that "lack[] finality in that they [are] also preparatory to later proceedings" do not meet this second requirement and are not appealable. (*Id.* at p. 653.)

Courts applying the second *Lakin* requirement in the child custody

14

and visitation contexts have concluded that postjudgment orders that are preliminary to final custody and visitation determinations are not appealable. (See *In re Marriage of Olson* (2015) 238 Cal.App.4th 1458, 1462 ["In this case, Christopher did not appeal from a court order finally approving or denying a modification of custody, but rather from an order that the parties attend a parenting plan assessment. This order was 'preparatory to [a] later proceeding[]' and therefore not appealable."]; *In re Marriage of Lloyd* (1997) 55 Cal.App.4th 216, 219–220 ["Here, as the guardian ad litem was obviously appointed in contemplation of future hearings and orders on custody and visitation, the appointment order was preliminary to these future proceedings and not appealable"].)

The trial court's February 25 order does not meet the second *Lakin* requirement since it was entered in contemplation of further proceedings.[8] As noted above, Priscilla's application to set aside the VDOP was brought in response to Steven's petition for custody. The trial court's denial of Priscilla's application did not resolve the underlying custody issue. While the trial court entered an order denying Steven's request for custody the week before the court's ruling refusing to set aside the VDOP, the court made clear that this was an "interim" order because "the VDOP [was] being challenged and in flux during the pendency of the action." Further, the record indicates that Steven renewed his request for custody in the wake of the trial court's refusal to set aside the VDOP. Indeed, in her request that the trial court stay its order, Priscilla acknowledged that Steven had a "pending RFO for child custody."

---

[8]     Thus, we need not consider whether the court's order meets the first requirement of raising issues "different from those arising from an appeal from the judgment." (*Lakin, supra*, 6 Cal.4th at p. 651.)

15

Thus, the trial court's February 25 order denying Priscilla's application to set aside the VDOP was preliminary to later proceedings determining custody. For this additional reason, the court's order denying Priscilla's application to set aside the VDOP was "preparatory to later proceedings" and is not an appealable postjudgment order under Code of Civil Procedure section 904.1, subdivision (a)(2). (*Lakin, supra*, 6 Cal.4th at p. 653.)

Priscilla also briefly argues that the February 25 order is appealable "under the collateral order doctrine." (*Macaluso v. Superior Court* (2013) 219 Cal.App.4th 1042, 1049.) As the *Macaluso* court recounted, " ' "[W]here the trial court's ruling on a collateral issue 'is substantially the same as a final judgment in an independent proceeding' [citation], in that it leaves the court no further action to take on 'a matter which . . . is severable from the general subject of the litigation' [citation], an appeal will lie from that collateral order even though other matters in the case remain to be determined. [Citation.] . . . [¶] . . . [Citation.]" ' " (*Ibid.*) However, where the order on appeal is not " 'truly "distinct and severable from the general subject of the litigation," ' " and is "a necessary step," to the ultimate decision in the case, the order is not appealable under the collateral order doctrine. (*In re Marriage of Grimes & Mou* (2020) 45 Cal.App.5th 406, 419.)

For reasons we have already explained, the trial court's order on Priscilla's application to set aside the VDOP was not severable from Steven's custody request. On the contrary, a determination of Steven's parentage was a predicate step for the court's final resolution of Steven's petition. Indeed, *Priscilla's* counsel argued in the trial court that the determination of the validity of the VDOP was an issue that the court needed to decide before ordering custody in favor of Steven, arguing that to rule otherwise would be "putting the cart before the horse." Priscilla's counsel also told the trial court

16

that while Steven "wants to ask the Court for some temporary child-sharing orders, . . . we would be opposed to that until, you know, the parentage issue is actually resolved." The trial court also explained the connection between the two issues in entering the interim order denying Steven's request for custody while the validity of the VDOP remained to be litigated, stating, "So with the VDOP being challenged and in flux and just during the pendency of the action and for the reasons that I've just stated, I'm declining the request to make interim custody and visitation orders at this time, based on this record, where the legal process stands right now."

In sum, the trial court's ruling on the request to set aside the VDOP was not " 'truly "distinct and severable from the general subject of the litigation" ' " (*In re Marriage of Grimes & Mou, supra*, 45 Cal.App.5th at p. 419). Instead, the court's ruling on Priscilla's request to set aside the VDOP was related, and even integral, to Steven's request for custody. Accordingly, we conclude that the February 25 order is not appealable pursuant to the collateral order doctrine either.

B. *We grant Priscilla's alternative request to treat her appeal as a petition for extraordinary writ relief*

Priscilla requests that, to the extent the trial court's February 25 order is not appealable, we exercise our discretion to treat her appeal as a petition for writ of mandate. We grant Priscilla's request.

In *Olson v. Cory* (1983) 35 Cal.3d 390 (*Olson*), the Supreme Court explained that, although a reviewing court has the "power to treat [a] purported appeal as a petition for writ of mandate," it "should not exercise that power except under unusual circumstances." (*Id*. at p. 401.) Among the circumstances under which the *Olson* court relied in exercising its discretion to treat the appeal in that case as a petition for writ of mandate were the following: a lack of clarity as to whether the order at issue was appealable

17

(*ibid.*); the lack of an adequate remedy at law caused by the fact that a delay in the resolution of the issue might lead to "unnecessary trial proceedings" (*id.* at p. 400); and the adequacy of the existing briefing and record to consider the appeal as a writ (*id.* at p. 401).

Courts applying *Olson* have noted that when the issue "presents a pure question of law," this may also support a reviewing court's use of its discretion in this manner. (*Black Diamond Asphalt, Inc. v. Superior Court* (2003) 114 Cal.App.4th 109, 115; see *Ofek Rachel, Ltd. v. Zion* (2024) 106 Cal.App.5th 1119, 1124.) This is particularly true where the trial court wrongly decided the issue and the trial court's error may have collateral consequences. (*Black Diamond Asphalt*, at p. 115.)

In this case, while we have determined that the February 25 order is not appealable, "the issue of appealability was far from clear in advance." (*Olson, supra*, 35 Cal.3d at p. 401.) There is no published applicable case law on the appealability of an order denying an application to set aside a VDOP generally, much less where, as in this case, the order was preliminary to further custody proceedings. Accordingly, we agree with Priscilla that "the law on appealability of the order [at issue] is unclear," and supports an exercise of our discretion to consider her purported appeal as a writ petition.

In addition, to require the parties to wait for resolution of the validity of the VDOP might lead to unnecessary trial proceedings and potentially disruptive changes of custody. If the trial court were to grant Steven custody after refusing to set aside the VDOP, as Priscilla argues, "Stella will have been removed from Gianni's custody, placed in Steven's, only to be returned to Gianni *years later* if an appeal from an eventual custody judgment [examining the trial court's VDOP ruling] in the case prevails." Thus, "the record sufficiently demonstrates the lack of adequate remedy at law

18

necessary for issuance of the writ." (*Olson, supra*, 35 Cal.3d at p. 401.) Further, the record is sufficient for a writ proceeding and adequate for us to decide the issue in controversy. (*Ibid*.) The briefing is also adequate, particularly given that the parties have filed supplemental briefing on the issue we conclude is dispositive.

Moreover, the legal validity of the VDOP appears to present a question of law, on which, as we discuss below, the parties and the trial court apparently overlooked a dispositive subdivision of the statute requiring a different outcome. Furthermore, the trial court's ruling declaring Priscilla's marriage "invalid" may have significant collateral consequences that would be avoided by our proper application of the overlooked provision. These circumstances further support the conclusion that we should exercise our discretion to treat Priscilla's appeal as a petition for writ of mandate.

Under the above circumstances, we conclude that it is appropriate to treat Priscilla's appeal as a petition for writ of mandate and proceed to the merits.

C. *The October 5, 2021 VDOP is void as a matter of law*

In her supplemental brief, Priscilla claims that the VDOP at issue is void under section 7573.5 because, at the time Priscilla signed it, Gianni was Stella's presumed parent under section 7611, subdivision (b) since he and Priscilla at least "attempted to marry each other by a marriage solemnized in apparent compliance with law," and Stella was born "during the attempted marriage." (*Id*., subd. (b)(1).) Priscilla's claim requires us to interpret sections 7353.5 and 7611, subdivision (b).

1. *We exercise our discretion to consider Priscilla's claim notwithstanding any possible forfeiture*

In her opening brief, as she did in the trial court, Priscilla argued that the VDOP was invalid because Gianni was a presumed parent to Stella

19

pursuant to section 7611, *subdivision (a)*. And, as noted above, the parties did not discuss section 7611, *subdivision (b)* in the trial court, and that court did not consider this subdivision in its order. Steven, however, does not raise any argument in his supplemental brief that Priscilla forfeited reliance on this subdivision by failing to discuss it in the trial court. In any event, even assuming it could be said that Priscilla forfeited this claim, we have inherent discretion to consider it. (See *People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6 [stating that an appellate court generally has discretion to consider unpreserved claims].) Several circumstances support our exercise of that discretion here.

To begin with, the theory that the VDOP was invalid under section 7611, *subdivision (b)* because Priscilla and Gianni had attempted to marry each other in a duly solemnized marriage raises a question of law based on undisputed facts that is closely related to the claim Priscilla did raise, namely that the VDOP was invalid because Gianni was actually married to Priscilla at the time she signed the VDOP and that he is a presumed parent under *subdivision (a)* of section 7611. The same underlying facts are applicable to both theories, and if we were to disregard the attempted marriage theory under subdivision (b), it could frustrate the policy of the controlling statute. In addition, a proper interpretation of the statutory scheme has the potential to impact nonparties (including Stella and Gianni) and pertains to the fundamental public policy of the state governing marriage and parentage. Finally, we have afforded the parties the opportunity to file supplemental briefing on the issue. Accordingly, we elect to exercise our discretion to consider Priscilla's claim notwithstanding any possible forfeiture.

2. *Principles of statutory interpretation*

" 'We interpret a statute de novo, applying relevant rules of statutory construction.' " (*Cantarella, supra*, 191 Cal.App.4th at p. 921.) We seek " ' "to adopt the construction that best gives effect to the Legislature's intended purpose." [Citation.] In determining that intended purpose, we follow "[s]ettled principles." [Citation.] "We consider first the words of a statute, as the most reliable indicator of legislative intent." [Citation.] In doing so, we give the words "their usual and ordinary meaning," viewed in the context of the statute as a whole. [Citation.] As part of this process, " ' "[every] statute should be construed with reference to the whole system of law of which it is a part so that all may be harmonized and have effect." ' " ' " (*Make UC a Good Neighbor v. Regents of University of California* (2024) 16 Cal.5th 43, 55.)

In addition to these general precepts, where, as here, the statutes at issue have been adopted as part of a uniform act, we may consider how courts in other jurisdictions have interpreted their versions of the uniform act. (*Kirzhner v. Mercedes-Benz USA, LLC* (2020) 9 Cal.5th 966, 978 (*Kirzhner*); see also *In re Baby Girl M.* (1984) 37 Cal.3d 65, 71 ["Our interpretation is also consistent with the public policy which led to the Uniform Parentage Act and other relevant civil code sections"].)

3. *The relevant VDOP provisions*

"[A] man may attain legal parent status by coexecuting a [VDOP] with a child's unmarried birth mother. . . ." (*In re A.H.* (2022) 84 Cal.App.5th 340, 349, fn. 2.) Section 7573 authorizes the signing of a VDOP in relevant part as follows: "(a) The following persons may sign a [VDOP] to establish the parentage of the child: (1) An unmarried woman who gave birth to the child and another person who is a genetic parent." Section 7573.5, however, provides that a VDOP "is void if, at the time of signing," any of several

21

circumstances is true. One such circumstance is that "[a] person other than the woman who gave birth to the child or a person seeking to establish parentage through a [VDOP] is a presumed parent under . . . subdivision (a), (b), or (c) of Section 7611." (§ 7573.5, subd. (a)(1).)[9]

The legislative history of the VDOP statute makes clear that this basis for voiding a VDOP was a considered choice of the Legislature. In 2011, the Legislature specifically amended the Family Code to clarify that a VDOP is invalid if, at the time the VDOP was signed, "the child already had a presumed parent under subdivision (a), (b), or (c) of Section 7611." (Stats. 2011, ch. 185, § 3.) The legislative history of the bill that enacted the law (Assembly Bill No. 1349 (2011-2012 Reg. Sess.) (Assembly Bill 1349)) explained that "the purpose for disallowing a married woman to sign the voluntary declaration of paternity is to 'preserve marriages and the marital presumption of paternity.' [Citation.] In addition to preserving marriages and the marital presumption of paternity, the public policy of California is ensuring that every child has two parents. If a married woman has a child, the husband is presumed to be the father, thus the child has two parents, biological or not." (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 1349 (2011–2012 Reg. Sess.) as amended Apr. 14, 2011, p. 8.) Thus, the Legislature enacted Assembly Bill 1349 to "clarify that a voluntary declaration of paternity is invalid if the marriage presumption of paternity applies, or if a presumption from . . . [s]ection 7611 (a)–(c) applies which also relates to a woman who is either married or has attempted to get married to the father of her child." (*Ibid.*)

---

9    Although not relevant in this case, section 7611, subdivision (c) provides that a person may obtain presumed party status by certain circumstances occurring "[a]*fter* the child's birth." (Italics added.)

22

Furthermore, the author of the bill explained that the amendment was to protect the rights of presumed parents as follows: " 'In a custody battle between a mother and a presumed (non-biological) father, the mother can find the biological father, sign a voluntary declaration of paternity with him, and preclude the first man from participation in the child's life. Biological parents in same sex couples can use the same tactic to exclude the non-biological presumed parent. The voluntary declaration process was meant to facilitate the establishment of parentage in uncontested situations; it was never designed to address competing parentage presumptions.' " (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 1349 (2011–2012 Reg. Sess.) as amended Apr. 14, 2011, p. 5.) The author of the bill also explained, "Where there is a presumed parent under [section] 7611[, subdivisions] (a)–(b) . . . another man cannot sign a valid voluntary declaration according to [former section] 7612[, subdivision] (e) [current section 7573.5]. . . . When a voluntary declaration of paternity is invalid, the presumed parent may bring an action to establish parental relationship under the Uniform Parentage Act." (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 1349, *supra*, p. 7.)[10]

In sum, the plain language of section 7353.5 provides that a VDOP is void, if at the time of the signing, the child already has a presumed parent under section 7611, subdivisions (a), (b), or (c) who is neither the birth parent nor the person claiming parentage through the VDOP. The legislative history makes clear that the Legislature specifically adopted this provision

_____

[10]    Although section 7573.5 is no longer codified as part of California Uniform Parentage Act (CUPA; § 7600 et seq.), its statutory predecessor was codified within the CUPA. (See former § 7612, subd. (e); Stats. 2011, ch. 185, § 3).)

23

for the purpose of protecting the rights of presumed parents and advancing fundamental public policies pertaining to parentage.

    4. *The relevant presumed parent provisions*

    " 'The [CUPA] (§ 7600 et seq.) "provides the framework by which California courts make [parentage] determinations. [Citation]" ' [Citation.] A person qualifies as a natural parent either by giving birth or by meeting one of the applicable statutory methods for being adjudged a natural parent. [Citation.] Section 7611 sets forth several rebuttable presumptions through which a person may be presumed to be a natural parent . . . . 'Biological fatherhood does not, in and of itself, qualify a man for presumed father status under section 7611. On the contrary, presumed father status is based on the familial relationship between the man and child, rather than any biological connection.' " (*M.M. v. D.V.* (2021) 66 Cal.App.5th 733, 740–741, fns. omitted.)

    " 'Section 7611 sets forth a number of rebuttable presumptions of paternity, mostly concerned with various forms of marriage or attempted marriage to the child's mother. [Citation.] "The statutory purpose [of section 7611] is to distinguish between those fathers who have entered into some familial relationship with the mother and child and those who have not." ' " (*In re M.Z.* (2016) 5 Cal.App.5th 53, 63.)

    Section 7611 provides in relevant part:

> "A person is presumed to be the natural parent of a child if the person meets the conditions provided . . . in any of the following subdivisions:
>
> "(a) The presumed parent and the child's natural mother are, or have been, married to each other and the child is born during the marriage, or within 300 days after the marriage is terminated by death, annulment, declaration of invalidity, or divorce, or after a judgment of separation is entered by a court.

24

"(b) Before the child's birth, the presumed parent and the child's natural mother have attempted to marry each other by a marriage solemnized in apparent compliance with law, although the attempted marriage is or could be declared invalid, and either of the following is true:

"(1) If the attempted marriage could be declared invalid only by a court, the child is born during the attempted marriage, or within 300 days after its termination by death, annulment, declaration of invalidity, or divorce.

"(2) If the attempted marriage is invalid without a court order, the child is born within 300 days after the termination of cohabitation."

Considering first the text of section 7611 generally, the plain language of *both* subdivision (a) and (b) evinces the Legislature's intent that a person may become a presumed parent of a child even where that person's marriage to the child's birth parent is invalid. (See § 7611, subd. (a) [permitting a parent to become a presumed parent where "the marriage is terminated by . . . annulment . . . [or] declaration of invalidity," under certain circumstances]; *id.*, subd. (b) [permitting a parent to become a presumed parent where "the attempted marriage is or could be declared invalid," under certain circumstances].)

Also consistent with the statutory text, California case law has repeatedly recognized that a person may achieve presumed parent status through either *marriage* or *attempted* marriage. (See, e.g., *Adoption of Baby Boy W.* (2014) 232 Cal.App.4th 438, 451 ["a man generally is presumed to be the father of a child if he has married, or has attempted to marry, the child's mother"]; *J.R. v. D.P.* (2012) 212 Cal.App.4th 374, 384, fn. 1 [citing section 7611 as involving "presumptions arising from marriage or attempted marriage"]; *Brian C. v. Ginger K.* (2000) 77 Cal.App.4th 1198, 1206 ["The core theme of the first three of these rebuttable presumptions [in section 7611] is

the marriage (or attempted marriage) of the natural father to the natural mother," and noting the "presumptions in cases of invalid marriages"].)

Turning our attention to subdivision (b) of section 7611, although there is no California authority interpreting the meaning of "attempted to marry each other by a marriage solemnized in apparent compliance with law," the Supreme Court of Utah in *In re Adoption of C.C.* (Utah 2021) 491 P.3d 859 (*Adoption of C.C.*) persuasively interpreted similar language contained in the Utah version of the Uniform Parentage Act. The statute at issue in *Adoption of C.C.* provided that a man is presumed to be the father of a child if "before the birth of the child, he and the mother of the child married each other in apparent compliance with law, even if the attempted marriage is or could be declared invalid, and the child is born during the invalid marriage or within 300 days after its termination by death, annulment, declaration of invalidity, or divorce or after a decree of separation." (Former Utah Code § 78B-15-204(1)(c), Utah Laws 2008, ch. 3, § 1386, p. 578; renumbered Utah Code Ann. § 81-5-204(1)(c).) The *Adoption of C.C.* court concluded that a man, J.S.P., was the presumed parent of a child even though his statutory status was based on an "admittedly" invalid marriage. (*Adoption of C.C.*, at p. 865.)

The facts of *Adoption of C.C.* were as follows. J.S.P. attempted to marry K.C. in New Hampshire in 2013. (*Adoption of C.C., supra*, 491 P.3d at p. 861.) The couple "requested and received a marriage license, participated in a marriage ceremony, and received a certificate evidencing the 'fact of the[ir] marriage.'" (*Ibid.*) However, because K.C. was married to another man at that time, the attempted marriage was bigamous, and "invalid *ab initio* — 'absolutely void without any legal process,'" under New Hampshire law. (*Id.* at p. 865.) After separating from J.S.P. in late 2016, K.C. gave birth to C.C. in August 2017 in Utah. (*Id.* at p. 861.) Two days after the birth,

K.C. signed a relinquishment of her parental rights and a consent for C.C.'s adoption in which she attested that she was unmarried. (*Ibid*.) K.C. made this statement based on her "knowledge that her 2013 marriage to J.S.P. had been entered into at a time when she was still married to another man." (*Ibid*.)

In determining whether J.S.P.'s consent was required for the adoption, the *Adoption of C.C.* court concluded that the district court had erred in concluding that J.S.P. was not C.C.'s presumed parent. (*Adoption of C.C., supra*, 491 P.3d at pp. 864–865.) The court explained, "A presumed father's statutory status cannot be defeated by a determination that the marriage was invalid or void at the outset. That is clear from the plain language of the statute, which provides that presumed fatherhood arises from an 'attempted marriage' in 'apparent compliance with law'–'even if' such 'attempted marriage is or could be declared invalid.'" (*Id*. at p. 865, quoting former Utah Code § 78B-15-204(1)(c).)

In "hold[ing] that the 2013 marriage was entered into in 'apparent compliance with law,'" the *Adoption of C.C.* court interpreted the statutory phrase "apparent compliance with law" in relevant part as follows:

> "Perhaps there is ambiguity in some of the statutory words when read in isolation. Sometimes *apparent* means 'obvious' or 'manifest.' [Citation.] And in that sense, the 2013 marriage was not in 'apparent compliance with law.' But we do not interpret statutory words in isolation. We read them in context. [Citation.] And here the context forecloses the 'obvious' or 'manifest' sense of *apparent*. The statute is using *apparent* in the alternative sense of 'ostensible' or 'seeming.' [Citation.] That is clear from the above-noted fact that a presumed father's statutory status arises from an 'attempted marriage' even if it 'is or could be declared invalid.' [¶] An attempted marriage is thus in 'apparent compliance' with the law where it is entered into in ostensible or seeming compliance with the law. That

27

requirement is met where the would-be spouses apply for and receive a marriage license and procure an official certificate of marriage." (*Adoption of C.C., supra,* 491 P.3d at p. 865.)

In addition, the *Adoption of C.C.* court rejected, "as incompatible with the governing statute," the argument that J.S.P. was not a presumed parent because "at least one (if not both) of the parties to the 2013 attempted marriage knew that it was not in 'apparent compliance' with the law." (*Adoption of C.C., supra,* 491 P.3d at p. 866.) After acknowledging that some "related provisions of law . . . prescribe a requirement of knowledge or good faith belief of a spouse," the court noted that this "statute includes no such requirement." (*Ibid.*)[11]

As noted, when interpreting a uniform act, we consider the decisions of other jurisdictions to ensure the law is applied in a uniform manner. (*Kirzhner, supra,* 9 Cal.5th at p. 978, citing *Porter v. Gibson* (1944) 25 Cal.2d 506, 512.) We find persuasive the *Adoption of C.C.* court's interpretation of "apparent compliance with law" text that appears in both the Utah and California statutes. (Former § 78B-15-204(1)(c); Fam. Code, § 7611, subd. (b).) To the *Adoption of C.C.* court's reasoning, we also add that the word

_____

11 The *Adoption of C.C.* court further "conclude[d] that the child was born within the required time frame—'during the invalid marriage or within 300 days after its termination' by one of the means prescribed by statute." (*Adoption of C.C., supra,* 491 P.3d at p. 865.) The court reasoned "C.C. was born 'during' J.S.P.'s 'invalid marriage' to K.C. That is clear from the fact that the marriage was not terminated by one of the mechanisms specified by statute— 'by death, annulment, declaration of invalidity, or divorce or after a decree of separation.' [Citation.] Those are the only terminating events that could cut off J.S.P.'s presumed father status under section 78B-15-204(1)(c). And the absence of any of those terminating events reinforces the conclusion that C.C. was born 'during' an 'invalid marriage.' " (*Adoption of C.C.,* at p. 866.)

28

"[a]pparent" modifies "compliance with law," suggesting an intent for the statute to apply where it appears that the couple was legally married, a state of affairs that is undoubtedly met in California when the would-be spouses obtain "an official certificate of marriage." (*Adoption of C.C., supra,* 491 P.3d at p. 865.)[12]

The Utah court's reasoning is also consistent with California Supreme Court cases that have concluded, since the early days of statehood, that even a marriage that is invalid as between the parties may be given effect with respect to children arising from such relationship. (See, e.g., *Estate of Filtzer* (1949) 33 Cal.2d 776, 779 ["A purported marriage which, by reason of a legal disability existing at that time [one of the parties already married], is rendered void [as creating a bigamous relationship between the parties] and so 'deemed null in law' as regards them, nevertheless comes within the scope of the legitimating statute for the protection of the issue, who become 'in relation to their father, the inheritors of his name, his heirs apparent, and entitled to look for, and demand from him, his care, maintenance and protection' "]; *Graham v. Bennet* (1852) 2 Cal. 503, 506 ["The ceremony which was instituted by the parents, although illegal and void as to them, is declared sufficient to protect their offspring"].)

Thus, we conclude that a "presumed parent and the child's natural mother have attempted to marry each other by a marriage solemnized in apparent compliance with law, although the attempted marriage is or could

---

12   Indeed, under California law, even where the parties do not obtain the *certificate* of marriage, they may still be married if they obtain a marriage license and have it authenticated after a solemnization ceremony. (See *Chaney v. Netterstrom* (2018) 21 Cal.App.5th 61, 65–66 (*Chaney*).) We need not consider that circumstance in this case, since it is undisputed that Priscilla and Gianni obtained a certificate of marriage.

be declared invalid," under section 7611, subdivision (b) where they have applied for and received a marriage license and procured an official certificate of marriage.

We next consider paragraphs (1) and (2) of subdivision (b), which prescribe the relevant time frame during which presumed parent status is acquired for a qualifying attempted marriage under the subdivision. A person obtains presumed parent status under section 7611, subdivision (b)(1) if "the child is born during the attempted marriage," so long as "the attempted marriage could be declared invalid only by a court." In contrast, "[i]f the attempted marriage is invalid without a court order," presumed parent status is obtained only if "the child is born within 300 days after the termination of cohabitation." (§ 7611, subd. (b)(2).) Thus, we must consider whether a confidential marriage obtained by an inaccurate statement that the parties are "living together as spouses" is invalid only with a court order or even without a court order.

California law statutorily makes incestual marriages "void from the beginning" (§ 2200) and it makes certain bigamous marriages "illegal and void" (§ 2201, subd. (a)). Even assuming that these marriages might be said to be "invalid without a court order" (§ 7611, subd. (b)(2)), there is no such California statute or case law authority providing that a confidential marriage (§ 500) obtained by an inaccurate statement that the parties are "living together as spouses" is void *ab initio*.

Indeed, far from being *void without a court order*, case law suggests that such marriages may in fact be *valid*. In *Chaney, supra,* 21 Cal.App.5th 61, the Court of Appeal considered whether a couple's decision "[f]or personal and financial reasons," not to return a confidential marriage license to the government invalidated the marriage. (*Id.* at p. 63.) In concluding that the

30

marriage was valid, the *Chaney* court reasoned, "They applied in person for a confidential marriage license at the office of the county clerk.  They exchanged vows declaring each other spouses at a solemnization ceremony. After the ceremony, the officiant authenticated the marriage license; he was not told that the wedding was a ruse.  *At that point, the parties were married.*"  (*Chaney, supra*, 21 Cal.App.5th at p. 66, italics added.)  Parties who wrongly state that they are "living together as spouses" (§ 500) still appear to comply with the essential components of a confidential marriage as outlined in *Chaney*.

In addition, in *Cantarella, supra*, 191 Cal.App.4th 916, the Court of Appeal concluded that "[w]e do not believe the Legislature intended a marriage to be . . . rendered invalid," even "where a party failed to register *public* evidence of the marriage." (*Id.* at p. 924, first italics omitted and second italics added.) The *Cantarella* court acknowledged that "the keeping of accurate and complete marriage records benefits the public," and noted a bill analysis of a statute that the Legislature declined to adopt expressed concerns that the proposed law might expand the use of confidential marriages and thereby "diminish the pool of information contained in public records." (*Id.* at p. 924, fn. 9.) The *Cantarella* court reasoned, however, that the goal of complete and accurate registration of marriages "pales compared to the societal importance of recognizing the validity of marriages to which parties have consented." (*Id.* at pp. 924–925.) *Cantarella* supports the conclusion that, while public policy is furthered by encouraging the accurate registration of all marriages, that policy may not be so strong as to invalidate marriages obtained by those who obtain a confidential registration of their marriage by erroneously stating that they are "living together as spouses." (§ 500.)

In any event, we need not, and do not, determine the actual *validity* of a confidential marriage obtained in this fashion. Given the absence of any statutory authority providing that a confidential marriage obtained upon a false statement that the parties are then living together as spouses is "invalid without a court order," (§ 7611, subd. (b)(2)) and the fact that nothing on the face of such a marriage certificate itself would reflect its invalidity, we conclude that such an attempted marriage could, *at most*, be "declared invalid only by a court." (§ 7611, subd. (b)(1).) Accordingly, we conclude that a person who has obtained a confidential marriage to a birth parent based upon

32

an inaccurate statement that the couple has been "living together as spouses," (§ 500) nevertheless obtains presumed parent status under section 7611, subdivision (b)(1) over a child who is born "during the attempted marriage."

5. *The October 5, 2021 VDOP is void because the record conclusively demonstrates that, at the time Priscilla signed the VDOP, Gianni was a presumed parent to Stella under, at least, section 7611, subdivision (b)(1)*

The record establishes that Priscilla and Gianni obtained a facially valid marriage certificate on October 19, 2020 and that Stella was born on October 4, 2021. Thus, in light of our interpretation of section 7611, subdivision (b) above, Priscilla and Gianni, at a minimum, "[b]efore [Stella's] birth . . . attempted to marry each other by a marriage solemnized in apparent compliance with law," even assuming "the attempted marriage is or could be declared invalid." In addition, there is no legal basis to conclude that their marriage was "invalid without a court order." (§ 7611, subd. (b)(2).) This remains true, even if the trial court correctly determined that Priscilla "was not cohabiting as spouses with [Gianni] when securing the confidential marriage license, as required by . . . section 500."[13] Even assuming strictly for the sake of this opinion that the trial court's finding in this regard would support invalidating Priscilla and Gianni's marriage,[14] the marriage "could be declared invalid only by a court" (§ 7611, subd. (b)(1).) Therefore, since the record conclusively establishes that Stella was "born

---

[13] We express no opinion as to the correctness of this conclusion.

[14] While we direct the vacatur of the trial court's order declining to set aside the VDOP, including that aspect of the order declaring Priscilla and Gianni's marriage invalid, we resolve this matter without determining the validity of Priscilla and Gianni's marriage.

during the attempted marriage," we conclude that Gianni was Stella's presumed parent under section 7611, subdivision (b)(1) at the time of her birth and the following day when Priscilla and Steven signed the VDOP. Since Gianni was already Stella's presumed parent at the time Priscilla and Steven signed the VDOP naming Steven as her father, it is void as a matter of law. (§ 7573.5.) Accordingly, the trial court erred in denying Priscilla's application to set aside the VDOP.[15]

6. *Steven's arguments to the contrary are not persuasive*

In his supplemental brief, Steven contends Gianni was not Stella's presumed parent under section 7611, subdivision (b)(1) at the time Priscilla signed the VDOP. We distill two primary arguments in his supplemental brief in support of this claim but find neither argument persuasive in light of the analysis we offer above.

First, Steven argues that to hold "that the confidential marriage certificate requirements were ostensibly or seemingly met, would require the court to overlook both a material misrepresentation under oath and the absence of statutory compliance, effectively rewriting the Family Code to validate a marriage (or attempted marriage) that does not come close to meeting the minimum legal standards under the licensing framework." As explained above, however, we neither validate Priscilla and Gianni's marriage, nor overlook the trial court's finding that they obtained such marriage by incorrectly attesting that they had been "living together as

---

[15] In light of our conclusion, we need not consider Priscilla's claim that the trial court erred in denying her application to set aside the VDOP because, at the time she signed the VDOP, Gianni was a presumed parent to Stella under section 7611, *subdivision (a)*. Nor need we consider Priscilla's claim that the trial court's order should be reversed on the ground the court did not prepare an adequate statement of decision.

spouses." (§ 500.) On the contrary, we merely hold that, consistent with the text of section 7611, subdivision (b)(1), even an "attempted marriage," that "is or could be declared invalid," may give rise to presume parenthood status under certain circumstances, and that those circumstances are present in this case.

Second, Steven contends that Priscilla and Gianni did not act in good faith in obtaining their confidential marriage, since, according to Steven, they "committ[ed] perjury" by falsely stating that they were living together as spouses to obtain their marriage license. Again, we are not persuaded. To begin with, we emphasize that the trial court did not determine that either Priscilla or Gianni *knew* their statement that they were "living together as spouses" was false, as would be required to support a perjury conviction. (See *People v. Lucero* (2019) 41 Cal.App.5th 370, 406 [stating that one of the elements for the crime of perjury is knowledge that the statement is false].)[16]

---

[16] Without opining as to the state of Priscilla and Gianni's knowledge on this point, we note that we are not aware of case law making clear what it means to live together "as spouses" under section 500. We are aware that the Court of Appeal in *Hassan* stated, " 'Living together as husband and wife' has been described as the ' "holding forth to the world by the manner of daily life, by conduct, demeanor and habit, that the man and woman who live together have agreed to take each other in marriage and to stand in the mutual relation of husband and wife; and when credit is given by those among whom they live, by their relatives, neighbors and acquaintances to these representations and their continued conduct, then habit and repute arise and attend upon cohabitation." ' [Citation.] Occasional illicit intercourse with a person is not sufficient to establish that they have been 'living together as man and wife.' " (*Hassan, supra*, 168 Cal.App.4th at pp. 1314–1315.) The *Hassan* court, however, was focused on the "living together" requirement of section 500 (see *id*. at pp. 1313–1315), and the court also stated, "Living in the same dwelling is the most significant characteristic of daily life that creates the impression that a couple is married." (*Id*. at p. 1315.)

And, in any event, even assuming strictly for the sake of this opinion that we could ascribe such an intent to them, we have concluded above that section 7611, subdivision (b), like the analogous Utah statute construed by the *Adoption of C.C.* court, applies to an attempted marriage solemnized in apparent compliance with the law even if one or both parties knew it was not in actual compliance. (See *Adoption of C.C., supra*, 491 P.3d at p. 866.) Finally, published authority establishes that a party who acts with perjurious intent in obtaining a confidential marriage may be prosecuted for offering a false or forged instrument for recording. (See *Hassan, supra*, 168 Cal.App.4th at p. 1313 [record contained sufficient evidence to support conviction for offering a false or forged instrument for recording (Pen. Code, § 115, subd. (a)) where defendant falsely stated he was "living together" with spouse].) Thus, our decision does not "excus[e] perjury," as Steven contends.

## DISPOSITION

The petition for writ of mandate is granted.  Let a peremptory writ of mandate issue directing the trial court to vacate its order denying Priscilla's application to set aside the October 5, 2021 VDOP and to enter a new order granting Priscilla's application.  The trial court may conduct further proceedings on Steven's petition for custody consistent with this opinion.  Priscilla is entitled to recover costs pursuant to California Rules of Court, rule 8.493(a)(1)(A).

BUCHANAN, J.

WE CONCUR:

O'ROURKE, Acting P. J.

RUBIN, J.